## SAMUEL PARSONS

*v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed December 20, 1905.*

1. CRIMINAL LAW—*evidence of previous quarrels with deceased is competent.* In a trial for wife murder, where the killing is admitted but is claimed to have been accidental, it is competent to prove previous quarrels and disagreements between the accused and the deceased.

2. SAME—*the burden of proving mitigating circumstances is on the accused.* The killing being proved, the burden of proving circumstances of mitigation or that justify or excuse the homicide devolves on the accused, unless those facts are manifest from the proof on the part of the prosecution.

3. SAME—*when instruction as to circumstantial evidence is not objectionable.* An instruction defining circumstantial evidence and concluding with the statement that if the facts and circumstances shown by the evidence are sufficient to satisfy the jury of the guilt of the accused, they should find him guilty, is not open to objection on the part of the accused.

4. SAME—*when instruction as to malice is not erroneous.* An instruction holding that malice includes not only anger, hatred and revenge, but every other unlawful and unjustifiable motive; that it is not confined to ill-will, but denotes an action flowing from a wicked motive,—a thing done with a wicked mind,—and that malice is implied from any deliberate or cruel act against another, however sudden, which shows an abandoned and malignant heart, is not erroneous.

5. SAME—*instruction defining justifiable homicide in language of statute is proper.* An instruction for the People which merely defines justifiable homicide in the words of section 148 of the Criminal Code is not objectionable.

6. SAME—*when instruction as to considering different aspects of the case is properly refused.* An instruction holding that if the

jury believe, from an examination of the evidence in certain of its aspects, that the accused is guilty, and if they believe, from an examination of the evidence in other aspects, the accused is not guilty, they should adopt that view which would lead to acquittal if it is as reasonable as the view which would lead to conviction; is properly refused.

7. SAME—*substantial repetitions of instructions may be refused.* It is not error to refuse to give instructions which, though not objectionable, are substantial repetitions of other instructions which have been given for the same party.

WRIT OF ERROR to the Circuit Court of St. Clair county; the Hon. B. R. BURROUGHS, Judge, presiding.

On October 6, 1903, plaintiff in error was indicted by the grand jury of St. Clair county for the murder of his wife, Virginia Parsons, by shooting her with a pistol on the 21st day of July, 1903, at their home in the city of East St. Louis. To the indictment a plea of not guilty was entered. The defendant was put upon his trial, and on November 14, 1903, the jury returned a verdict, finding the plaintiff in error guilty, and fixing his punishment at imprisonment in the penitentiary for the term of his natural life. A motion for a new trial was made and overruled; and judgment was thereupon entered upon the verdict and sentence passed against the plaintiff in error.

Plaintiff in error was married to the deceased, then Virginia Bonner, at Little Rock, Arkansas, on October 30, 1897. Plaintiff in error appears to have been brought up on a farm in Texas, and before his marriage was a railroad man. For some time after his marriage he lived in Little Rock, and was engaged as an underwriter for an investment company. From Little Rock he went to Mt. Pleasant, Texas, where he was engaged in railroad work for the St. Louis, Iron Mountain and Southern Railway Company, and lived there for about a year. From there he went to Mississippi, and worked for a railway company; and in 1900, after living at Greenville, he went to Water Valley, Mississippi. During this

time he and his wife lived together, though they appear to have been occasionally separated. Plaintiff in error and his wife came from Paducah, Kentucky, where her mother lived, to East St. Louis, some time after Christmas, 1902. Prior to that his wife had left him, and gone back to Paducah to her mother. They had one child, a little girl about four years old. Upon arriving at East St. Louis they rented a couple of rooms where they lived for a few weeks; then they went to live at a boarding house where they staid until some time in June, and then went to the house, known as 819 Winstanley avenue, where they lived when the shooting took place in the next month. Plaintiff in error's occupation, when working for the railroad, was that of a switchman. The evidence tends to show numerous quarrels between plaintiff in error and his wife, and that he several times left her.

On July 21, 1903, plaintiff in error had charge of a gambling game, called a "crap game," in a saloon in East St. Louis, run by a man named Jones. On the night of that day, July 20, 1903, plaintiff in error went home, arriving there about ten o'clock, or a little after. The door was locked, and his wife let him in. A Mrs. Goldman or Coleman was boarding with them; and she and Mrs. Parsons had not retired for the night, but had let down the windows and closed and locked the doors. The house, where they lived, consisted of four rooms, the first of which is designated in the testimony as the "front room;" the next room was the sleeping room, in which there was a bed, and which was occupied by plaintiff in error and his wife as a bed-room, and called in the testimony the middle room. He and his wife and little girl slept in the bed in the middle room. There was a door leading from the front room into the bed-room or middle room. There was also a door leading from the porch into the front room, and to the right of this door was a window looking out upon the porch. There was also a window on the left side of the front room. The bed was placed

diagonally across the middle room, the head being towards the right corner and the foot towards the left corner.

The plaintiff in error claims that he went to bed, and went to sleep, and was awakened in the middle of the night, about midnight or shortly thereafter, and heard a noise in the front room. He states that he mistook his wife for a burglar, and shot her. His version of the shooting is, that he had been sleeping about an hour and a half when he was suddenly wakened by a noise; that, when he heard the noise, he raised up, but was not wide awake at that time, but dazed; that, when he heard the noise, he shot immediately just as he straightened up; that he turned and raised up, sitting in bed, and shot; that he hadn't his eyes open; that he could not see anything as it was dark. According to his statement, he shot through the door opening from the front room into the bed-room, and struck his wife, who appears to have been near the window of the left wall of the front room. A Mrs. Berry lived next door to plaintiff in error and his wife at 817 Winstanley avenue. She was on her front porch, attending to a sick child in a hammock, and heard the firing of a revolver. She went into the house and asked what had happened, and Parsons told her that he had shot his wife for a burglar. She says that Mrs. Parsons was lying where she was shot, under the side window of the front room next to Mrs. Berry's house, near to the window, but that her head was out about three feet from the window; that the window was up, and the screen was lying on the floor near the window where she had been shot; that the shot was fired at about 12:30 o'clock; that, when she got to where Mrs. Parsons was lying, Mrs. Parsons said, "You have killed me, get mother." Mrs. Berry states that Parsons came home about 10:30 that night, while she was on the porch with a sick child, and was talking loud; that she could hear more or less of what was said; that they were quarreling over the fact that Mrs. Parsons had purchased some rugs, and had given $9.50 for them; that she heard Parsons say: "I know over

the river I can get all the rugs I can carry for $2.50 a piece, and I won't pay no such prices, and you'll have to take them back;" that they spoke unusually loud; that she heard Mrs. Parsons say that she would just as leave pay the money for the rugs, as to pay it for "whisky, whoring and gambling;" that they quarreled for about a half an hour and then were quiet, and then she heard nothing more, until she heard the report of the revolver and heard Mrs. Parsons scream; that she ran down to the corner of the house and called out, "What is the matter? What is the matter?" three or four times; that she did not get an answer right away, but finally Parsons came out of the door and said, "I have shot my wife; for God's sake get some one to get a doctor." The deceased lived until about six o'clock in the morning when she died. During the time, while Mrs. Parsons lived, the defendant did what he could to alleviate her pains, and frequently expressed his sorrow, giving vent to his feelings by the shedding of tears.

WEBB & WEBB, and GEORGE A. CROW, for plaintiff in error.

W. H. STEAD, Attorney General, for the People.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

It is admitted that the plaintiff in error killed his wife. The only question, is whether or not his statement is true that he killed her accidentally, mistaking her for a burglar, or whether he willfully murdered her. He states that, when he reached home, she told him that a burglar had tried to make an entry into the house; and that there had been previously thereto one or more attempts to enter the house.

Section 155 of chapter 38, of the Revised Statutes, being the Criminal Code, is as follows: "The killing being proved, the burden of proving circumstances of mitigation, or that

justify or excuse the homicide, will devolve on the accused, unless the proof on the part of the prosecution sufficiently manifests that the crime committed only amounts to manslaughter, or that the accused was justified or excused in committing the homicide." (Hurd's Rev. Stat. of Ill. 1899, p. 596).

Whether the homicide was justified or excusable for the reasons stated by the plaintiff in error, was a question of fact for the determination of the jury. In *Steffy* v. *People,* 130 Ill. 98, which was an indictment for an assault with intent to murder, we said (p. 99) : "Whether the evidence warranted the verdict was a question of fact peculiarly within the province of the jury to determine, and great weight is to be given to their finding. Courts are reluctant to substitute their opinion for that of the jury upon controverted questions of fact. To justify this court in reversing, on the ground that the evidence was insufficient, it must appear that the finding of the jury is not sustained by the evidence, or that it is palpably contrary to the decided weight of the evidence." (*Gainey* v. *People,* 97 Ill. 270; *McCoy* v. *People,* 175 id. 224; *Gilman* v. *People,* 178 id. 26; *Johnson* v. *People,* 202 id. 53). In *McCoy* v. *People, supra,* which was an indictment for murder, it was said (p. 229) : "Plaintiff in error insists that the evidence is not sufficient to sustain a conviction. The law has placed the determination of that question with the jury, and it is only when this court is satisfied, from a careful consideration of the whole testimony, that there is a reasonable doubt of the guilt of the accused, that it will interfere with the verdict of the jury on the ground that the evidence does not support the verdict." We are unable to say, in the case at bar, that the evidence does not sustain the verdict of the jury.

There was much in the conduct of the plaintiff in error after the killing of his wife, which tended to confirm his statement in regard to it. But there was also much in the evidence to contradict the truthfulness of his statement.

In the first place, the evidence showed that the plaintiff in error and his wife, both before they came to East St. Louis and after they came there, lived an unhappy life and quarreled much with each other, and separated several times from each other. One witness, who was a next door neighbor when they lived in Water Valley, Mississippi, states that not a day passed when they did not quarrel; that one day he knocked his wife out of the back door of the house, and hit her on the left cheek, and struck her twice in the face with his fist; that on several occasions his wife was heard screaming, and he was heard cursing her. Another witness testified that, when they lived at Water Valley, Parsons and his wife were engaged in a quarrel up-stairs and he cut up her dress and she came out of the house crying; that on the next day he stated to witness that he could not get along with her; that he cut up her dress for spite, and was going to leave her, and did leave her, and stayed away eight or ten days, and finally they made up and went back together to the house; that he said he could not get along with her, and that she was hard to get along with. Another witness says that at one time he heard some one screaming and hollering, and went to see what the matter was, and Mrs. Parsons was getting out of the window of the house, screaming like some one in trouble or distress; that Parsons locked her out of the house, and she stayed at the witness' house all night, and next morning plaintiff in error said that she was hard to get along with; that they could not get along together, and he was going to leave; that he left her, and she came to witness' house and stayed a couple of days when she went home to her mother at Paducah. Another witness testifies that, when they lived at Water Valley, Mrs. Parsons was taken sick, and the neighbors brought food for her, and Parsons refused to pay for it, and came home only occasionally during her sickness. Another witness testified that she heard him tell his child to call her mother ugly names; that he said, "Call your mother a bitch and a liar and a whore and a

fool." Another witness testifies that at Paducah, Kentucky, plaintiff in error slapped his wife, and knocked her down.

There is also testimony on both sides of the question whether or not it was possible for the plaintiff in error to have shot his wife through the door, leading into the adjoining room in the manner, in which he stated that he fired the shot. One of the physicians, who called to see the deceased after she was shot, stated that the window of the front room could not be seen by any one in the bed, except by a man sitting near the foot of the bed with his feet on the floor, and leaning forward. Another physician states, in substance, that one, standing at the foot of the bed and on the right-hand side, could see through the door, but it is quite clear from the evidence that any one lying or sitting on the bed in any position could with difficulty see the window in the front room through the door. Plaintiff in error says that, when he heard the noise at the window which aroused him from sleep, he took his revolver from under his pillow, and in a semi-conscious condition raised up and fired. From all the evidence upon this subject it was for the jury to say whether it was possible for him to have shot through the doorway towards the window with such deadly accuracy, while he was half asleep and could see nothing on account of the darkness. One of the physicians says that, when he asked Mrs. Parsons how it happened, she said: "He says he took me for a burglar."

Plaintiff in error gave contradictory statements as to the pistol, with which he did the shooting. He told the police officer who arrested him about six o'clock in the morning that "his brother was here on a visit last Christmas and left the pistol with him, and ever since then he had no use for it, and he lent it to a man by the name of Taylor, who was bar-tender at this place, where he was working. He told me this before his wife died; that Taylor told him last night that he had no more use for the gun, that he had better take the gun home, and that Taylor gave him the gun, 'and if I

had riot taken the gun home I would not have shot my wife.' Mr. Taylor is bar-tender at Mr. Jones', at 351 Broadway, East St. Louis. He told me he never carried it before. The defendant was very excited, I must say. He seemed as though he was very sorry for what he had done, the way it looked to me. He was not crying after our first conversation with him." The plaintiff in error in his testimony said that he carried the pistol with him backwards and forwards when he went home at night, and that he had the pistol with him under his pillow. The witness, Taylor, testified that plaintiff in error never gave him any pistol, and never asked him to keep any pistol; that there was one in the drawer at the saloon, but he "could not say whether that is the one or not; I could not say whether there was a pistol in the drawer after that night or not. He had access to the drawer where the pistol was kept. Mr. Parsons was running the crap game. * * * He left at nine o'clock as near as I can remember. He seemed to be all right, sober." The testimony of plaintiff in error in regard to the pistol, as given upon the trial, differs from the statement made by him to the policeman, who arrested him, and is contradicted in material respects by the evidence of the witness, Taylor.

Without further discussion or analysis of the testimony it is sufficient to say that it is not of such a character, as to justify our interference with the verdict of the jury, nor can we say that such verdict is not supported by the evidence.

It is contended by the plaintiff in error that the court erred in admitting evidence as to quarrels and disagreements between plaintiff in error and his wife. But we are of the opinion there was no error in permitting such testimony to be introduced. It has been held that, where a husband or wife is charged with the murder of the other, it is competent to prove their mutual conduct towards, and treatment of each other, as manifested by acts and words. Wharton in his work on Criminal Evidence, (8th ed. sec. 786), states the rule as follows: "Long ill-treatment by husband of wife;

misconduct leading to a suit against him by his wife to compel good behavior; and continual quarrels between husband and wife are relevant to prove motive in cases of marital homicide."

Objection is made to the first instruction, given on behalf of the prosecution, mainly upon the ground that it is argumentative in character. It states in substance that circumstantial evidence in criminal cases is the proof of such facts and circumstances, connected with or surrounding the commission of the crime, as tends to show the guilt or innocence of the party charged, and that, if the facts and circumstances shown by the evidence in this case are sufficient to satisfy the jury of the guilt of the plaintiff in error, they would be authorized in finding him guilty. It properly states to the jury that they must be satisfied of the defendant's guilt beyond a reasonable doubt, and that circumstantial evidence is legal evidence. The doctrine of the instruction is supported by the following cases decided by this court: *Adams* v. *People,* 109 Ill. 444; *Bressler* v. *People,* 117 id. 422; *Gannon* v. *People,* 127 id. 507; *Carlton* v. *People,* 150 id. 181; *Dunn* v. *People,* 158 id. 586; *Keating* v. *People,* 160 id. 480.

Objection is made that the court gave for the prosecution the third instruction, given by it, which is as follows: "The jury are instructed that malice includes not only anger, hatred and revenge, but every other unlawful and unjustifiable motive. Malice is not confined to ill-will towards an individual, but is intended to denote an action flowing from any wicked and corrupt motive—a thing done with a wicked mind, where the fact has been attended with such circumstances as evince plain indications of a heart regardless of social duty, and fatally bent on mischief; hence malice is implied from any deliberate or cruel act against another, however sudden, which shows an abandoned and malignant heart." This instruction was approved by this court in *Jackson* v. *People,* 18 Ill. 269, and *McCoy* v. *People,* 175 id. 224.

Objection is also made to the fifth instruction, given for the State. We see no objection to this instruction, as it merely defines justifiable homicide in the same language, *literatim et verbatim,* as is used in section 148 of the Criminal Code. (Hurd's Rev. Stat. of 1899, p. 595).

It is also claimed that the court erred in refusing to give the first refused instruction, asked by the plaintiff in error. This instruction told the jury that "as a matter of law, if you believe from an examination of the evidence in certain of its aspects that the defendant is guilty, and if you further believe from an examination of other aspects of the evidence, that the defendant is not guilty, then you should adopt that view of the evidence which will lead to the acquittal of the defendant rather than that view which leads to his conviction, if that view of the evidence leading to his acquittal is as reasonable as that which leads to his conviction." There was no error in refusing this instruction, inasmuch as one aspect of the evidence might have been that all the testimony on behalf of the People was false and perjured, and another aspect might have been that all the testimony on the part of the plaintiff in error was true, and the jury would be obliged to find the defendant not guilty. Substantially a similar instruction was condemned by this court in *Adams* v. *People, supra.* Complaint is made that the court refused to give the second refused instruction asked by the plaintiff in error, which is as follows: "The court further instructs the jury that you must presume the defendant to be innocent until his guilt is fully established by legal evidence, beyond a reasonable doubt, and the presumption of innocence prevails throughout the trial, and it is your sworn duty as jurors trying this case, to reconcile, if possible, the evidence in this case with this presumption." This instruction might well have been given, but its refusal was not erroneous for the reason that its substance is embodied in other instructions, which were given for the plaintiff in error. The first instruction is as follows: "The court instructs the jury

that the defendant at the outset of the trial is presumed by the law to be an innocent man, and he is not required to prove himself innocent or to put in any evidence at all upon that subject. And in considering the testimony in this case, you must look at the testimony and view it in the light of the presumption which the law clothes the defendant with, that he is innocent, and it is a presumption that abides with him throughout the entire trial of the case until the evidence convinces you to the contrary beyond a reasonable doubt."

Instruction, numbered 6, given for the plaintiff in error is as follows: "The court further instructs the jury that the law presumes the defendant to be innocent of the charge preferred against him by the indictment returned to the court by the grand jury, until all of the allegations in such indictment have been proven to be true, beyond a reasonable doubt, and the law is that he is entitled to have this jury indulge in such presumptions of innocence towards him until you may believe from all the evidence, that he has been proven guilty beyond a reasonable doubt, and the fact that he has been indicted by the grand jury upon a charge of murder and is now being tried upon that charge is not evidence of his guilt, and you are not to consider that fact, or the indictment in this cause, any evidence of his guilt, and if you convict the defendant you must do so upon all the evidence in the case, and you cannot give any weight to any belief to which you may arrive, except that belief be founded upon the facts and evidence introduced before you in this case. And if after you have heard all the evidence, you then have a reasonable doubt in your minds as to the defendant's guilt, then it is your duty to find him not guilty."

The seventh instruction, given for the plaintiff in error, told the jury, among other things, as follows: "The burden of proof is upon the People in this case to show the guilt of the defendant, and all the presumptions of the law, independent of the evidence, are in favor of his innocence. The law presumes every defendant who has been indicted and

charged with crime, to be innocent until he has been proven guilty, beyond all reasonable doubt. And in this case, the court instructs you that if, after you have considered all the evidence in the case, you then have a reasonable doubt as to the guilt of the defendant, then the defendant is entitled to the benefit of that doubt, and you should acquit him." . Complaint is also made of the refusal of the court to give the third refused instruction asked by the defendant. Said third refused instruction is as follows: "The jury are further instructed that in order to convict the defendant upon circumstantial evidence, it is necessary not only that all the circumstances concur to show that he committed the crime charged, but that those circumstances are inconsistent with any other reasonable conclusion than that of his guilt. It is not sufficient to entitle the prosecution to a conviction that the circumstances coincide with, account for, and render probable the hypothesis of guilt sought to be established by the prosecution, but those circumstances must exclude, to all moral certainty, every other hypothesis but the single one of the guilt of the defendant, or the jury must find the defendant not guilty." The substance of this instruction is set forth in the fourth instruction, given for the plaintiff in error, to-wit: "The court further instructs the jury that to warrant the conviction of the defendant, each fact necessary to establish his guilt, must be proven by competent evidence, beyond a reasonable doubt, and all the facts and circumstances proven should not only be consistent with the guilt of the defendant, but inconsistent with every other reasonable hypothesis or conclusion than that of guilt, to produce in your minds a reasonable and moral certainty that the defendant committed the offense as charged in the indictment."

The judgment of the circuit court is affirmed.

*Judgment affirmed.*