THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ZINA CURTRIGHT, Plaintiff in Error.

*Opinion filed April 19, 1913.*

1. CRIMINAL LAW—*when admission of conversation in evidence is not error.* Where an objection is made to the admission of a conversation in evidence because it was not in the presence of the defendant but the witness states that it was in the room and near the defendant, it is not error to admit the testimony even though the court subsequently strikes it out because in doubt as to whether the defendant heard it.

2. SAME—*when the effect of admitting evidence subsequently stricken out is not prejudicial.* The effect of admitting in evidence, in a murder trial, a conversation which the court struck out because in doubt as to whether the defendant heard it is not prejudicial, where such testimony was immediately followed by proof of another conversation of the same purport which was in the presence and hearing of the defendant.

3. SAME—*what testimony by physicians is not admissible as expert testimony but is admissible as proof of an actual test.* In a murder trial, proof that two physicians, before *rigor mortis* had set in, made an actual test with the body of the victim by putting the revolver in her hand and bending her arm to see whether it would have been possible for her to have fired the shot, and that they considered it was impossible for her to have done so, is not admissible as expert testimony, but it is competent as proof of an actual test, and the error of the court in admitting it as expert testimony is immaterial.

4. SAME—*what is competent in rebuttal of evidence that the defendant was peaceable and law abiding.* On the trial of a man for the murder of his wife, where the defendant offers evidence that he was peaceable and law abiding, that he treated his wife kindly and that she admitted she had a good home and a good husband, it is competent to prove, in rebuttal, that at different times the defendant brought men to his house and drank whisky and beer there, against his wife's objection and protest; that he called her a vulgar name and ordered her to fix them up some whisky, which she refused to do.

5. SAME—*when instruction as to weighing the evidence is not misleading.* In Illinois, instructions calling the attention of the jury to the conduct and demeanor of the defendant during the trial are not permitted; but an instruction is not subject to that objection which authorizes the jury to determine which witnesses are worthy of credit from a consideration of their appearance on the

witness stand, their interest (if any) in the event of the suit, their temper, feeling of bias, (if any had been shown,) their demeanor while testifying, their apparent intelligence or lack of intelligence, their means of information, and all the surrounding circumstances on the trial.

6. SAME—*when instruction as to what constitutes murder is not incorrect.* An instruction telling the jury that if they believe, from the evidence, beyond a reasonable doubt, that the defendant killed the deceased, as charged in the indictment, under circumstances showing no considerable provocation but showing an abandoned and malignant heart upon the part of the defendant, then the law pronounces it murder, is not incorrect, as omitting the element of malice aforethought, as the law implies malice from the facts stated in the instruction.

7. SAME—*when an instruction is not contrary to rule that court should not, in its instructions, give especial significance to particular facts.* Where the whole purpose of an instruction in a murder trial is to inform the jury that the defendant would have no right to kill his wife because she had been guilty of improper conduct with another man and had written letters to such man, the instruction is not contrary to the rule that instructions must not be given which impress the jury with the belief that the court attaches especial significance to particular facts.

WRIT OF ERROR to the Circuit Court of Piatt county; the Hon. W. G. COCHRAN, Judge, presiding.

REDMON & HOGAN, and HERRICK & HERRICK, for plaintiff in error.

P. J. LUCEY, Attorney General, THOMAS KASTEL, State's Attorney of Piatt county, W. THOMAS COLEMAN, State's Attorney of Douglas county, and THOMAS E. GILL, (JAMES HICKS, and JOHN H. CHADWICK, of counsel,) for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The plaintiff in error, Zina Curtright, was indicted in the circuit court of Douglas county for the murder of his wife, Daisy Curtright. The venue was changed to Piatt

county, and after a jury trial the court sentenced him on the verdict to imprisonment in the penitentiary for the term of fourteen years.

Daisy Curtright came to her death in a room on the second floor of a hotel in Tuscola, Douglas county, in the presence of the defendant and their child, four years old, by a shot from a revolver. The bullet entered the body near the right shoulder, between the first and second ribs, about three and a half inches from the supersternal notch, being two inches below in a direct line and three and one-quarter inches to the right. The direction of the bullet was to the left and downward, and it did not touch any bone until it reached the breast bone, which was grazed by it on the inside, after which it entered the lining over the heart, punctured the right chamber of the heart and struck the fourth rib on the left side, where it was found below the left breast. The question in dispute at the trial was whether Daisy Curtright committed suicide or was murdered by the defendant.

There was evidence, not objected to, of the following facts: The defendant married the deceased about seven years before her death, when he was thirty-three years old and she was nearly seventeen years of age. She was his second wife, and there were two children of the first marriage. They had one child, mentioned above, and when first married they lived on a farm near St. Marie, in Jasper county, but soon after the marriage they moved to St. Marie, where he became a bar-tender. In October, 1909, she took the child and went to the home of her parents, in St. Marie. The defendant went to see her twice and persuaded her to return, and she remained with him until on March 1, 1910, when she again left and took the child to the home of her sister, Mrs. Oscar Hill, at Tuscola. She had written a number of letters to a young man, Louis Berren, showing that illicit relations existed between them and manifesting an infatuation for him. The defendant learned

of the writing of the letters, and in the evening of March
16, 1910, he had a talk with Berren about them and de-
manded them, and they went to Berren's boarding house,
where the letters were surrendered. The defendant could
neither read nor write and he took the letters to the home
of the father and mother of his wife. It was about eleven
o'clock at night, but the mother got up and admitted him
and he threw the letters down on the table, telling her to
read them. She could not read, and he asked her where his
wife was. He was told that his wife said she was going
to Indianapolis, and the father and mother testified that he
then called his wife vile names and said he was going to
kill her on sight and was going to have his baby before that
time the next night. The defendant denied making the
threats. He learned from some other source that his wife
had gone to Tuscola, and on the morning of March 17,
1910, after taking two drinks of whisky, he left St. Marie
to go to Tuscola. His equipment for the journey was a
loaded revolver and a quart bottle of whisky. He was in
the habit of carrying a revolver, and he testified that he
did so because he was a bar-tender and carried the money
from the saloon at night. He arrived at Tuscola about
eleven o'clock in the forenoon in a state of intoxication and
offered a drink to a man whom he asked to show him to
Hill's residence. He reached Hill's house shortly before
twelve o'clock, where he found his wife doing a washing,
and asked her if she was not going to kiss him. She said
she never had refused and kissed him, and Mrs. Hill said
if they wanted to talk to go into the sitting room. He
drew the bottle of whisky from his pocket and set it on
the table. A glass, spoon and sugar were procured and he
drank a glass of whisky and then he went into the sitting
room with the child and lay down on the couch. Hill
and a brother of Daisy Curtright came to their dinner and
the defendant was invited to join them but said he did not
want any dinner; that he could not eat and had been living

258 — 28

on whisky for two weeks, and that he was going to a hotel
and get some rest.   In the sitting room he talked with his
wife and showed the letters, and, according to the testimony
for the prosecution, said that he had come for his baby,
and his wife could go along or go to hell.   Hill and the
brother left after eating their dinner.   There was evidence
for the prosecution that the defendant came into the kitchen
and fixed another drink and took it and again threw him-
self on the couch and lay there a few minutes, and then
drew the letters and the revolver out of his pocket and said,
"Look what I got last night at the point of a gun; I got
them from that Louis Berren," and said that his wife wrote
them and she had gone to the dogs, but Mrs. Hill said if
she had he had driven her to it; that he then shoved the
letters and the revolver into his pocket and put his arms
around his wife and began flourishing the revolver, saying,
with an oath, that he came for his baby and was going to
have her; that he said to Mrs. Hill that she could come to
their place but that this was his wife's last farewell visit,
and Daisy said to Mrs. Hill, "Yes, Hattie, you can come
down but I'll not be there; I never expect to get there
alive."   He wanted his wife to go back with him and her
sister advised her to go for the sake of the baby.   There
was a train leaving Tuscola about one o'clock, on which de-
fendant thought they could return to St. Marie, and his wife
got ready and they started for the depot.   When they went
down the steps he fell down and she picked up his hat for
him.   They missed that train and then went to the depot
of another railroad and found there would be no train on
that road until nine forty-five in the evening.   They then
went to a hotel, and being unable to get a room went to
another, where they were assigned to the room on the sec-
ond floor at the north-east corner of the building, which
contained a bed on the east side and a stand on the west.
After they had been in the room a short time the defendant
went out in the hall and called for water.   The hotel-keeper

carried water to the room and delivered it to the defendant's wife, and at that time he was lying on the bed and his coat was on the stand. Soon afterward the shot was heard and the defendant ran out into the hall and called to the hotel-keeper that his wife had shot herself and to get a doctor. The hotel-keeper and others hurried to the room and found Daisy Curtright lying on her back across the bed, with her feet hanging over in front. Her shirtwaist had been burned where the bullet had entered, and she was unable to speak but gasped a few times and died. When asked who did the shooting the defendant said to ask the child, and the child replied, "Mamma did it." There was evidence for the prosecution that the defendant told the child to say, "Mamma did it," which the defendant denied. As to the occurrence, he testified that he took off his coat and hat and laid them on the stand; that he took his shoes off and his wife took her outside skirt off; that he lay back across the bed and she sat down by his side; that he went to sleep and was awakened by the shot, and that she was falling and would have fallen by his side if he had lain still. Daisy Curtright had for several years, at least, been subject to neuralgia of the stomach and had been in the habit of taking morphine under the advice of a doctor. At times she had taken frequent doses of that drug and she sometimes drank whisky. The evidence so far was introduced without objection.

Mrs. Hill, while testifying about the occurrences at her home, was asked about a conversation between her and Daisy Curtright in which she was asked for advice about going back. The conversation was objected to because not in the presence of the defendant, but the witness said it was right inside the room and near the defendant. The objection was overruled, and she said that she told her sister to do as she pleased; that she would like to see her go back for the sake of the baby; that Daisy said, "I can go but I never expect to get there alive;" that the witness said,

"Why, Daisy?" and Daisy said, "Because he will kill me," and that the witness said, "I don't think so," but Daisy said, "You'll see." The court being in some doubt as to whether the defendant could hear the conversation it was stricken out, but it is urged that the defendant was prejudiced by it because the jury had the full benefit of it. There was no error in admitting the testimony, because it then appeared that the defendant could hear the conversation. It is true that the jury heard the testimony, but as it was immediately followed by testimony of a conversation in the presence and hearing of the defendant of the same purport it could not have worked any substantial injury to the defendant. Mrs. Hill said that after that conversation Daisy walked in and told the defendant she was going, and he said something to her about a coffin and that Daisy answered him back, and the witness asked what he said about a coffin. Daisy said her husband had told her he had bought a coffin before he left home and she told him he might have to buy two of them before it was over. This remark made her sister apprehensive that Daisy intended suicide, and she said, "You wouldn't do anything foolish or rash, would you? Think of your baby." To which Daisy replied, "No, I wouldn't, but he will," and repeated the belief that he would kill her.

There was other evidence for the prosecution to which objection was made and the objection overruled. Two doctors, one of whom performed an autopsy on the body and the other who was on the coroner's jury, were permitted to testify that they made an actual test to determine whether the dead woman could have inflicted the wound on her own body. This was done before *rigor mortis* had set in, by placing a revolver in her hand and by bending the arm, trying to point the revolver toward the wound and in the direction taken by the bullet, and they both testified that it was an impossibility. The court admitted the testimony as the opinion evidence of experts, and counsel on both sides have argued the question whether it was within the domain

of rules governing expert evidence.   It was not a matter of
skill or science but was within the common knowledge and
experience of all men of common intelligence in the ordi-
nary walks of life, and therefore was not a proper subject
for expert testimony.   But if the ruling was right it is im-
material whether the reason given for it by the court was
correct.   The act testified to, which might have been done
by anyone, was merely an actual test with the same person
and upon the same body for the purpose of determining
whether she could inflict the wound upon herself.   Any per-
son of ordinary intelligence who had not had the advantages
of an education at a medical college could have done the
same thing and aided the jury by substituting an actual trial
for speculation as to what the deceased could have done.
The principle involved was the same as in the case where
actual tests were made by witnesses as to the view which
could be had of persons and objects from the doorway of
the engine house in the case of *Hauser* v. *People*, 210 Ill.
253.   If a witness should testify that he saw an occurrence
from a particular position and it could be shown by an
actual test that there was some intervening natural and im-
movable object which would prevent the witness from see-
ing the occurrence, proof of the test would be competent,
and the same rule must apply here.   Aside from the testi-
mony as to the test, there was evidence which rendered
the theory of suicide practically unbelievable.   Daisy Curt-
right was a very short woman, four feet and nine inches in
height, weighing from one hundred and forty to one hun-
dred and fifty·pounds, very heavy for her height, right-
handed and with short arms.   How difficult it would be for
her to shoot herself as the wound was inflicted can be read-
ily seen, and there is the further fact that a person intending
suicide is practically certain to select a spot where a wound
would be likely to be mortal.   Every person of ordinary in-
telligence knows that the heart and brain are the seats of
life, and any attempt at suicide by shooting is directed to

one or the other.    It is different where one shoots another, since ordinarily there is neither deliberation nor opportunity for selecting the place of the wound.

Objections were also interposed to evidence offered in rebuttal as to the course of life of the defendant and his wife.    The defense offered evidence that he was peaceable and law-abiding, that he treated his wife kindly, and that she admitted she had a good home and a good husband. That evidence tended to show that their relations had been pleasant and that he had always treated her well, and in rebuttal the prosecution was permitted to offer evidence that at different times the defendant brought men to his house with him and drank whisky and beer there, against her objection and protest; that he called his wife a vulgar name and told her to fix them up some whisky, which she refused to do.    The evidence was competent.

The verdict of the jury was justified by the evidence and we could not reverse the judgment on account of any reasonable doubt arising out of the evidence.

Complaint is made of instruction No. 16 given at the request of the prosecution.    It is, in substance, the same as the first instruction given at the instance of the prosecution in *Parsons* v. *People,* 218 Ill. 386, where it was held to be a correct statement of the law and supported by numerous cases there cited.    It stated familiar rules of law as to circumstantial evidence, which are not questioned, but it is said that it ignored the testimony of the defendant, who was a witness in his own behalf, and his testimony was not circumstantial evidence.    The jury were told, in various instructions, to consider all the evidence in the case, and if, after weighing and sifting the entire evidence, they had any reasonable doubt of the guilt of the defendant it was their duty to acquit him.    This instruction required proof of circumstances sufficient to satisfy the jury of the guilt of the defendant beyond a reasonable doubt, and it did not have the effect of excluding such a doubt raised by the testimony

of the defendant himself. The jury could not have under-
stood, upon a consideration of all the instructions, that the
testimony of the defendant in explanation of the circum-
stances was to be disregarded.

Instruction No. 12 advised the jury that the credibility
of witnesses was a question for the jury, and that they had
the right to determine, from their appearance on the wit-
ness stand, their interest (if any) in the event of the suit,
the temper, feeling of bias, (if any had been shown,) their
demeanor while testifying, their apparent intelligence or
lack of intelligence, their means of information, and from
all the surrounding circumstances on the trial, which wit-
nesses were worthy of credit and to give credit accordingly.
Counsel say that this instruction was aimed at the defend-
ant, and informed the jury that they had a right to consider
his demeanor and conduct during the trial, for which vice
instructions were condemned in *Purdy* v. *People,* 140 Ill.
46, *Vale* v. *People,* 161 id. 309, and *People* v. *McGinnis,*
234 id. 68. The instruction applied to all witnesses and
said nothing about the demeanor or conduct of the defend-
ant which could not fairly be included as one of the sur-
rounding circumstances appearing on the trial. The jury
would naturally understand the instruction to refer to cir-
cumstances appearing in the evidence on the trial, and in
*Kelly* v. *People,* 192 Ill. 119, an instruction in the same
language as this one, including all the surrounding circum-
stances appearing on the trial, was held good. It may be
true, as contended by counsel for the People, that the jury
would necessarily be influenced as to the credibility of the
defendant by his conduct during the trial, but if it is im-
possible to prevent an unfavorable impression from the
conduct of the defendant while being excoriated and de-
nounced by the State's attorney or under other exasperating
conditions, it does not follow that the court would be right
in directing the attention of the jury to that subject. It is
probably true that a jury will necessarily gain an unfavor-

able impression from the failure of a defendant to testify, but if there were no prohibition of the statute it would be clearly wrong for the court to call the attention of the jury to such failure and direct them that they might properly be influenced by it. There is judicial authority for the instruction calling attention to the conduct and demeanor of a defendant during the trial, but such instructions are not permitted in this jurisdiction. The instruction in this case is not subject to the objection.

· It is objected that instruction No. 13 called attention to particular facts and gave them especial weight, contrary to the rule that instructions must not be given which impress the jury with the belief that the court attaches especial significance to certain facts. The whole purpose of the instruction was to tell the jury that the defendant would have no right to kill his wife because she had been guilty of improper conduct with another man and had written letters to the other man, and the jury could not have been advised of the law in that regard without mentioning the facts. ·

Instruction No. 8 is objected to for omitting the requirement that the killing, to constitute murder, must be with malice aforethought, which is included in the statutory definition of murder. It told the jury that if they believed, from the evidence, beyond a reasonable doubt, that the defendant killed the deceased, as charged in the indictment, under circumstances showing no considerable provocation but showing an abandoned and malignant heart upon the part of the defendant, the law pronounced it murder. The statute declares that malice will be implied if no considerable provocation appears or when all the circumstances of the killing show an abandoned and malignant heart, and as the law implies malice from the facts stated, the instruction was not incorrect. The instruction is the same as one given in *Jackson* v. *People,* 18 Ill. 269, which had the approval of this court.

The judgment is affirmed. *Judgment affirmed.*