## JIM HENNESSEE v. STATE.

No. A-8915.  Jan. 17, 1936.
Rehearing Denied Feb. 7, 1936.
(54 Pac. [2d] 217.)

John F. Thomas and John W. Tyree, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jesse L. Pullen, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error, for convenience referred to as the defendant in this opinion, was by

information charged with murder, tried and convicted of manslaughter in the first degree, and sentenced to serve a term of ten years in the state penitentiary.

The testimony on behalf of the state in substance is as follows: Trotter Mitchell stated:

"I live at 1111 G. street, Lawton, Okla., in the same house with the deceased and her former husband."

Some 2 or 3 weeks before the fatal shooting the defendant had stated, in referring to Fae Hennessee, his former wife:

"I would rather kill her now. She is the only human I ever saw I could ring her neck and throw her in the alley and feel good over it."

He knew of the defendant beating the deceased, pulling her out of bed by her hair, and making threats against her life, 2 or 3 weeks before the death of the deceased; that a week or more before the killing the deceased moved into a tent in what is known as Lawton View addition in the city of Lawton. Deceased had five children, and one was a little baby.

W. K. McKenzie, who was a justice of the peace in Lawton, testified that during April a complaint was filed by the deceased requesting that Jim Hennessee be placed under a peace bond; that the hearing was continued, and the matter was pending at the time the complainant was killed.

Mrs. Crawford Hawkins testified:

"I am a resident of Lawton View addition, near the Pair Filling Station, in Lawton, adjoining the lot where the deceased lived in a tent at the time she was killed; the deceased had been ill during the day and night prior to her being killed; I was over to see her and took her

some milk. Two or three days before the killing the defendant came to my place and looked around, and inquired of me where Fae was (using profanity) and stated among other things: 'Well, if they don't put her in jail, I am going to kill her.'

"This statement was made by the defendant a few nights before she was killed. I visited back and forth from the tent the deceased was living in to my house and carried some aspirin to the deceased, as she was at that time ill. I saw Howard Reynolds at the tent. I saw only a part of the fight between Howard Reynolds and the defendant, Jim Hennessee. When I went in the tent, Howard Reynolds had Jim Hennessee down on the bed in a scuffling or fighting position; Hennessee asked Reynolds if he was going to kill him, and Reynolds replied, 'No, all I ask you to do is to let me get away from here.' The deceased, Fae Hennessee, ran out of the tent in her night clothes, and I went in the tent and brought her dress out to her. After the fight, Mrs. Hennessee left with Howard and Hughie Reynolds, and the defendant left with Tar Hennessee and one Tate. The deceased begged to be taken to Bill Davis' place, stating that, if the defendant came back to the tent, he would kill her. The deceased went some distance away and then came back to my house; then left again on her way to the Davis place. After the deceased left a second time, Helen Hennessee and I heard some shots up by Pullens'."

The state introduced testimony showing the defendant overtook the deceased, Fae Hennessee, Howard and Hughie Reynolds on a hill where the engine of the car in which they were traveling had gone dead. Howard Reynolds was out trying to crank the car. The defendant shot Howard Reynolds three times. Fae Hennessee got out of the car and started running up the road, and the defendant took after her and shot and killed her. The evidence shows all of the parties were drinking. When the officers arrived at the scene of the killing, it was shown the auto-

mobile was facing west, that Howard Reynolds's body was west of the car 15 or 20 feet, and Fae Hennessee's body was east of the car about 30 or 40 feet. The body of Reynolds was lying on its back, and Fae Hennessee's body was on her knees and elbows, with her head on the ground between her elbows.

Witness W. P. Ford, the undersheriff, testified he examined the body of Fae Hennessee at the undertaking parlor, and there was a bullet wound on the left side of her neck; the bullet did not come out of her body.

It was further shown that earlier in the evening, Jim Hennessee had phoned the officers and they drove out to where he had reported he had a fight with the Reynolds boys. Hennessee had some knots on his head and his face was banged up, and one eye practically shut from swelling.

Chas. F. McCarty, sheriff of Comanche county, corroborated the testimony of the witness Ford with regard to the position of the bodies; and also stated when he found the bodies they were dead. Hughie Reynolds was in the car and had a bloody spot on his left eye, which he thought was a shot.

"I shook him and tried to get him to talk; took him out of the car and put him in an ambulance and sent him to the hospital."

The state offered testimony to show that a divorce had been granted Fae Hennessee on November 24, 1928; Helen Hennessee, the 14 year old daughter of the deceased, and a daughter of a cousin of this defendant by a former marriage, testified the defendant had made threats against the deceased, and stated he ought to kill her, that she was one woman he could kill and never lose any sleep over it;

what he ought to do was to take something over there and kill her and take the children away with him. She also testified the defendant brought whisky to this tent for her mother to sell, and likewise cursed her mother because she did not get enough out of it. Witness further stated that the defendant's statement to the effect that Howard or Hughie Reynolds made advances toward her were not true; that they never at any time approached her.

The witness Helen Hennessee further stated she did not know Mr. Clark, who testified in the case, and that he did not come to the tent the day before the killing; that she never saw him until yesterday; she knew Bob Johns; he came out to the tent the day before the killing, just before noon or about noon; she was there all the time Johns was there; that Howard Reynolds and her mother were not in bed together at that time, nor were they in bed together any time during the day. Howard Reynolds did not have his clothes off at any time. "I did not know what Bob Johns came there for. He remained about thirty minutes; he did not make his business known, and did not ask for Jim Hennessee."

The following statement made by the defendant, Jim Hennessee, to the county attorney, was introduced in evidence. It was signed by the defendant and witnessed by D. Moncrief, Jr., and Dwight Malcolm:

"I, Jim Hennessee, desire to state that the County Attorney warned me that if I made any statement concerning the death of my wife Fay Hennessee and Howard Reynolds that such statement would be used against me; that I did not have to make any statement, but if I did make any statement that he wanted me to tell nothing but the truth and with that understanding I am making the foregoing statement of my own free will and accord.

"Since about three weeks ago I have not been living with my wife and on yesterday the 12th day of April, 1934, I was told by Bob Johns that my baby boy was sick at the tent in which my wife was living and located one block south and one-half block west of Pair's filling station. This was about 4 or 5 o'clock in the afternoon and in a few minutes I went to the tent with Elmer Tate and Tar Hennessee and we went in Elmer's car. As I stepped in the tent I saw someone laying on the bed and it was kind of dark and I thought it was my wife and the sick baby and then I noticed Howard Reynolds rolled off my wife and he was dressed in his underware. I picked up a chair and started fighting Howard and he knocked me down several times and I was about knocked out and he put on his clothes and said he was going to leave and then Hughie Reynolds came in the tent and hit me several times and then Howard struck me with some heavy object and I was about out and laying on the bed, they went out of the tent and I heard them cussing Tar, who was outside the tent, and I went outside and they cussed me and Tar. Elmer and myself got in the car and left. On last Tuesday or Wednesday some of the boys told me that Hughie Reynolds was out to the tent and that he had pinched my little 14 year old girl on the breast and I got to thinking about all these things and I decided to call the sheriff and we went to Pair's filling station and I called the sheriff's office and Joe Bailey and Bill Ford came out in a few minutes and at that time it was between 6 and 7 o'clock in the evening and the officers went on out to the tent and went to the home of the county attorney and he was not at home and while we were parked in front of his house the two officers Ford and Bailey came up and they told me that they would pick the Reynolds up and that I could file a complaint in the morning. Then the three of us, Elmer Tate, Tar Hennessee and myself went back to Tar's restaurant which is located on 3rd street and I knew where they kept their gun and I went back behind the counter like I was going to get a drink and got the gun which was a 38 automatic pistol from behind the counter and slipped it in my pocket. No one saw me get the gun

and I did not ask if I could have it for the reason that it belonged to Mrs. Hennessee and I knew that she would not let me have it. I then left the cafe and walked up F street to the Frisco depot. I did not want anyone to see me because my face was all bloody and from the depot I went up 5th street and went down through the park and out Summit st. to 11th st. and some niggers came along and I asked for a ride and I got on the right hand running board of the car and rode with them to South Boundary and they turned west several blocks and where they turned south and I got off. I did not notice any car parked in the road as we went down the road but the lights were poor and my eyes were filled with blood and it might of been there and I did not notice it. I did not know the niggers I rode with but a man was driving and there was three or four children in the car and maybe a woman. I believe these niggers live in Lawton View addition. When I got off the car I started walking back east and it was pretty dark and suddenly I noticed a car parked without any lights just a few feet away, about that time I notice two persons standing by the car and about that time I heard Howard Reynold's voice and he said 'Here's the son of a bitch,' and started toward me and I started running and shooting and did not know whether I hit anyone or not. I ran on back down the road east and cut across the vacant block just west of Pair's filling station and *when* down 11th St. to Summit St. and cut down through the park and walked down 5th St. to the depot and went down F. St. to the cafe and went in and put the gun back behind the counter and went to the kitchen and washed my face and in a few minutes Joe Bailey came down and placed me under arrest.

"I did not know my wife was with the Reynolds when the shooting occurred and I believed that the two people standing by the car was Howard and Hughie Reynolds. I did not know there was a third person with them.

"I had not been drinking at the time these things happened and I did not know whether or not the Reynolds boys were drinking.

"From the time I left the cafe until I got back after the shooting I did not see anyone I knew except Howard Reynolds.

"This statement is made by me before D. Moncrief, Jr., and Dwight Malcolm."

The defendant, testifying in his own behalf, stated:

"I am 58 years of age; have lived in Comanche county about 30 years. I knew a divorce had been granted my wife in 1928. We were only separated at that time about 10 days. We went back together and have been living as man and wife ever since up until a short while before the trouble. We have five children living, one a boy about 18 months old. I did not make any threats against my wife or threaten to kill her, nor did I tell any one I would like to do my wife any bodily harm. The case that my wife started against me was never prosecuted, as she died before it was brought to trial.

"I went to the tent the afternoon before the killing; Mr. Johns had told me my baby was sick. Elmer Tate and Tar Hennessee went with me. I went in the tent; my wife was on the bed; she raised her head up and I said, 'How is the baby,' and she said 'All right.' I walked over toward the bed and Howard put up his hands and asked what I was going to do about it; that is about all I knew for a while. Howard and I had a fight, and Hughie Reynolds came in and struck me; Howard was fighting me when Hughie struck me. Mrs. Hennessee got out of the tent. The instrument introduced in evidence does not belong to me. When I left the tent I was bruised and beaten. I saw Slim Hawkins there. He came in behind Hughie, had his knife out, and said put it on Hughie, but I did not know he had his knife out—I could hear what he said. When I got into Tar's car to drive away from the tent, Hughie began to abuse me again; he called me every kind of a name in the world; I don't know what he did not say.

"I went to Pair's Filling Station, and called the sheriff to get them to come out and arrest the Reynolds boys. We went down to the county attorney's office, but he was

not at home. I went back to the tent then to get my hat which I had left on the table. There was nobody at the tent at the time I got my hat. When I failed to find the county attorney, I then went down to Third street to the restaurant. It was getting close to night at this time. I did not think the sheriff had been able to arrest the Reynolds boys. When I went back to the restaurant, I went behind the counter and got a gun that belonged to Tar Hennessee's wife. I figured how the Reynolds boys might be back there. I went up by the Frisco depot and on through the park on foot. It was dark. When I got to the edge of Summit street, there was a car came down Summit and I asked them to let me ride, and they slowed down and I got on the running board and the driver asked me which way I was going. They were colored people, and I did not know their names, but I think they live in Lawton View addition. I told them I was going out to old lady Sasser's filling station. When they turned off, I told them I would walk and I got off the car. I stopped in the road a little bit and came back down the road. I was in the highway that runs west from the southwest corner of town. My eyes were swollen and my eyesight was poor. My intention was to walk back to the first street that turns south from the block and come on a dark street down there because I did not want to come down the main road. Before I came to the place to turn off, I ran into this car stopped. I was walking pretty fast, and some one said, 'There is the God damn son of a bitch.' I looked as best I could; I knew his voice, and went to shooting; he was not very far from me and was moving toward me. I started on east and met another object and I shot one time at that. I did not know who it was. I thought it was Hughie Reynolds. It was dark out there. From the condition of my eyesight I could not tell a man from a woman. I came back to the restaurant. I aimed to wash my face and then go up to the police station. I did not get to the police station, as the officers came and arrested me at the restaurant."

Several witnesses were called by the defendant to show the dangerous character of Howard Reynolds, and

some were called to show the life the defendant and his wife had been leading in the community there where they were living. It was admitted by all parties they had been selling intoxicating liquors.

The defendant was the only witness to testify that was at the scene of the killing; he admits the shooting, but claims he knew Howard Reynolds' voice but did not know the other party he shot at, but thought it was Hughie Reynolds.

In his assignment of errors the defendant sets forth nine grounds which he alleges to be sufficient to warrant this court in reversing the judgment of the trial court. The first assignment argued by the defendant is that the court committed error in admitting incompetent and prejudicial testimony of the witness W. H. McKenzie, the testimony of W. H. McKenzie being to the effect that there had been filed in his court by Fae Hennessee, during the month of April, prior to the homicide, a complaint charging the defendant with misconduct; the said Fae Hennessee stating she was afraid her life would be taken by the defendant.

The defendant urges that the testimony of McKenzie was incompetent and prejudiced his rights before the jury. With this contention we cannot agree, for the reason that the defendant, while on the witness stand, admitted the case was pending against him and it had not been disposed of at the time Fae Hennessee was killed.

We hold that all the facts and circumstances prior to and leading up to the fatal difficulty which resulted in the death of Fae Hennessee were admissible to show the feeling of the defendant against the deceased and to show the deceased feared and apprehended he would do her great bodily harm, if not take her life.

In Tallon v. State, 22 Okla. Cr. 89, 210 Pac. 309, in the first paragraph of the syllabus, this court said:

"Evidence of the actions, conduct, and general demeanor of defendant a short time prior to the commission of the homicide is competent as tending to show the state of mind of defendant at the time of the killing."

It is next urged by the defendant that the court erred in refusing to give his special requested instruction on the question of the right of the defendant to fire the shots that caused the death of Fae Hennessee. The testimony of the defendant shows he did not know who the last party was he shot. The requested special instruction has been carefully studied with the general instructions given by the court. The general instructions substantially covered the law applicable to the facts, and the court did not err in refusing to give the special instruction requested by the defendant.

It is next urged by the defendant that the county attorney in his cross-examination of the defendant was guilty of misconduct, for the reasons that the question of the county attorney in effect charged the defendant of not caring for his children and not going to the funeral of one of them. The court has examined the record and read the questions propounded by the county attorney to the defendant, of which the defendant complains, and it discloses that the county attorney was examining the defendant as to his failing to provide for his family, and attempted to have him contradict his statements as to his intentions testified to by other witnesses, of his going to get the deceased out of the way and taking his children and caring for them.

And, further, it tended to show by the defendant himself that he had not been providing for, or taking proper

care of, his children. The cross-examination was proper, and the court did not err in permitting the questions.

The testimony in this case shows a most deplorable tragedy, one that cannot be condoned, and without any mitigating circumstances. It shows a wife with a number of children, living in a tent, one a small child of 18 months, the father living in the same city, and, if the testimony of his 14 year old daughter is to be believed, and it is not contradicted, was compelling his wife to sell whisky and quarreling and abusing her for not getting more for the whisky than she claimed to have received. And the wife, according to the testimony of the defendant, was living an immoral life. The other witnesses who testified for the state did not condemn the deceased, Fae Hennessee, as an immoral character. The defendant and deceased had been divorced for many years but evidently ignored the decree of divorce and had continued to live together. It is clearly shown by the testimony that the defendant on numerous occasions had threatened to take the life of the deceased. These threats and statements of the witnesses are denied by the defendant.

The record discloses that, after the fight with Howard and Hughie Reynolds at the tent where the wife was living, the defendant called the officers and stated the trouble to them, and wanted the officers to arrest the Reynolds boys; that the Reynolds boys had not been arrested. The defendant's testimony shows that afer leaving the tent he went back to the tent and got his hat, and then went to the restaurant operated by Tar Hennessee, a relation of his, and went behind the counter and placed in his pocket a pistol that belonged to Tar Hennessee's wife and left again. According to his own testimony, he went toward the place where his wife was living. He said he

took the pistol to protect himself, as he thought the Reynolds boys might be in the neighborhood where he was going. It is shown that after he had the fight with the Reynolds boys he went to the restaurant and armed himself with the pistol and went back out in the neighborhood where he had the difficulty with them for the purpose of seeing whether or not they were there with Fae Hennessee, and, if so, he intended to use the gun for the purpose of killing any of the parties he might find with his wife, and his wife. His version of the killing of Howard Reynolds and then shooting the other party will not stand an analytical test for truth; he says when he saw the car stopped in the road and heard Howard's remark, in which he called him a vile name, and started toward him, that he whipped out the gun and fired and started running, and as he passed by the car and was going up the street he met another object that he thought was Hughie Reynolds, and he shot him; this was the shot that took the life of Fae Hennessee. Hughie Reynolds was found in the car by the officers; he could not be aroused, and, as one of the officers stated he had a wound that he thought was a shot, he was rushed to the hospital.

It is perfectly apparent the defendant started out looking for and seeking trouble with the Reynolds boys and his wife; he had no business back in the neighborhood where his wife lived except for the purpose of bringing on another difficulty; he showed by the circuitous route he traveled his desire to avoid being seen; in fact stated he did not want to be seen.

This record has been carefully read and studied, and the court finds the defendant was accorded a fair and impartial trial; that the instructions of the court substantially and correctly advised the jury as to the law appli-

cable to the facts. There are no errors in the record warranting a reversal. The jury by its verdict it returned was very lenient with the defendant. The testimony in this case is sufficient to warrant the jury in returning a verdict against the defendant of murder.

The judgment of the trial court is affirmed.

EDWARDS, P. J., and DOYLE, J., concur.