## EDNA LAHOMA SKELLEY v. STATE.

No. A-9239. March 25, 1938.
(77 P. 2d 1162.)

David Tant, O. P. Estes, and Gordon Johnston, all of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and Lewis Morris, Co. Atty., of Oklahoma City, for the State.

BAREFOOT, J. The defendant was charged with the crime of murder in Oklahoma county, was tried, convicted of manslaughter in the first degree, and sentenced to serve a term of six years in the penitentiary and has appealed.

It was contended by defendant that the evidence was insufficient to support the verdict, that the cross-examination of defendant by the county attorney was improper, and that the court erred in giving certain instructions, and failing to give a requested instruction outlining the defense presented by defendant. All of these errors may be considered together. This necessitates a review of the evidence offered in this case. Able and exhaustive briefs have been filed by counsel for both defendant and the state. The brief of defendant gives a transcript of the evidence of each of the witnesses, and is a very fair statement of the facts, from the standpoint of both the state and the defendant, and it will be referred to in stating the facts in the case.

The deceased, De Loyd Skelley, and the defendant were husband and wife. On the 3d day of September, 1935, they resided at 1014 N. W. Thirty-Fifth street in Oklahoma City, and deceased operated a place of business at 1723 N. W. Sixteenth street in Oklahoma City, which was known as the Morris Fruit Juice Company, and in the same building he had a double dip ice cream parlor. He also operated in connection with his business a "racket" in the nature of drawing numbers, and where the winner at each drawing won a certain stated sum of money. Tickets for these drawings were sold by deceased through certain agents, and the

drawings were held by the deceased in that section of Oklahoma City where resided a great number of the colored race, who bought these tickets and attended these drawings. The drawings were generally held at night and defendant often accompanied deceased to assist him in conducting the drawings and especially in taking care of the money that was received. On several occasions deceased had been held up after conducting the drawings and had been robbed of the money he had received at the drawing. It was the night of one of these drawings, and defendant had accompanied him, and after they had returned home and about 10:30 o'clock that deceased was shot.

Harry E. Barnes, an intern at the Oklahoma City General Hospital, testified that he saw the deceased, De Loyd Skelley, when he was brought to the hospital on the night of September 3, 1935, and that in his opinion his death was caused from gunshot wounds.

Bessie Watkins, a maid in the Skelley home, testified that on the afternoon of the 3d of September, 1935, she was at the Skelley home when the deceased and the defendant had a difficulty; that she heard them talking and quarreling, and the defendant came to the kitchen and got a butcher knife; that she then went and got into one of the cars belonging to the Skelleys; that the deceased got out of the car that he was in and went and grabbed her out of the other car, and that he took the butcher knife away from her, but she did not know what he did with it; that after this deceased left in the Ford car and immediately thereafter defendant attempted to leave in the Buick car, but the key to the same was not there; that she saw defendant kick the glass out of the Buick car while she was attempting to start the same; that finally the defendant located the key to the Buick car, but before leaving she saw her cut a hole in the screen door with the butcher knife which the deceased had taken away from her; that prior to leaving in the car she had gone to the doctor's office, and had re-

turned just before the difficulty or quarrel between her and her husband.

W. J. Allston testified that he was district manager for the Pontiac automobiles and that he resided immediately across the street from where the Skelleys lived; that he did not know them personally; that on the afternoon of the 3d of September, 1935, his attention was attracted by a loud conversation in front of the Skelley home, but he could not hear what was said; that someone whom he identified as defendant was in a Buick car and apparently a man was taking the keys out of the car; that the man left in a Ford automobile and the woman attempted to start the Buick car; that she could not get it started, and she kicked the windshield out; that she got out of the Buick car and started in the house, and he saw her pick up a large knife in the yard and with it she slashed the screen; afterwards he saw her leave in the Buick car; later in the night he heard what he thought was the report of a gun across the street and afterwards he saw them carrying someone out of the house and placing them in a car.

Mrs. W. J. Laws testified that she was a neighbor of the Skelleys; that on the afternoon of September 3, 1935, she saw Mr. and Mrs. Skelley having some kind of dispute in front of their house; that she saw Mrs. Skelley kick out the windshield; she did not see her pick up a knife and did not see her slash the screen.

Charles Fuller testified, in behalf of the state, that he was employed by the deceased, De Loyd Skelley, and that at the time that Skelley lost his life, had been working for him about six or seven days; that on the afternoon of the 3d of September, 1935, Mrs. Skelley came into the business establishment of the deceased; that she had in her hand a small pistol; that she went back and talked to the deceased a short while in his office and then left. He stated that in his opinion the defendant was mad at the time she came to the store. He further testified that after leaving the de-

ceased's office, she went and got into the Buick automobile; that the deceased went out and talked to her for a few minutes and when she left she gunned the car and the deceased jumped out of the way and came back into the store and locked the door.

Ethurma Parker testified that on the 3d day of September, 1935, he was working as a porter for the Morris True Fruit Juice Company, which was operated by the deceased, De Loyd Skelley; that on that day he saw Mrs. Skelley; that she came into the store; that she was driving a Buick car; that he talked to her and she asked him if he knew where she could get some cartridges for her pistol; that he told her he thought he did, and would go and call and see; that he first went to the place of business of the deceased to use the telephone and deceased was using the telephone; that he then went into a beauty shop next door and called a drug store down on Reno and came back and told the defendant that she could get the cartridges at this drug store on Reno and Walker.

Luther F. Thompson, called as a witness in behalf of the state, testified that he worked for the Liberty Drug Store, located at Reno and Walker in Oklahoma City; that on the 3d day of September, 1935, the defendant, Mrs. Lahoma Skelley, came to his store and he sold her some pistol cartridges; that she said she wanted to get some shells and had the pistol with her; that he sold her about 19 shells, and put six of them in the gun for her, and she put the other shells in her purse.

George P. Harrison, police department lieutenant of Oklahoma City, testified that on the 3d day of September, 1935, he was called to investigate the shooting of De Loyd Skelley; that he went to 1723—A and B, West Sixteenth street, which was the business establishment of the deceased; that he found on the ground five cartridges, the cartridges being of the same make of those found in the gun with which the deceased was killed. This was after the shoot-

ing occurred. Some of the cartridges were found directly in front of the place of defendant, others in front of the adjoining place of business.

P. L. Borden, police officer of Oklahoma City, testified that on the 3d day of September, 1935, he answered a call at 1014 Northwest Thirty-Fifth street, said address being the home of the deceased and defendant; that when he got there the sister of defendant and two small children were at the address, and on an occasional chair in the living room he found a pistol, the pistol being State's Exhibit No. 2; that he looked in the chamber and smelled of the barrel and could see that the gun had been recently fired, one shell having been fired; that the gun was taken to the police station, and later turned over to Mr. Claud Tyler, county evidence man; he also stated that he found another gun in a chest of drawers in the southeast bedroom, this gun was identified as State's Exhibit No. 5; he also found a purse at the home of these parties, and in the purse he found 12 pistol shells; that there was also a large hunting knife in the purse. The knife and the shells, being identified, were introduced in evidence.

W. W. Harbolt, police officer of Oklahoma City, testified that he answered a call at 1014 Northwest Thirty-Fifth street about 10:15 p. m., September 3, 1935; his testimony corroborated the testimony of Officer Borden.

Arahevilla Ridenhour, an aunt of the deceased, testified that she resided at 24½ West Grand avenue, Oklahoma City; that she was well acquainted with the defendant, Lahoma Skelley, and knew her voice and could distinguish her voice over the telephone; that on the night of the 3d of September, 1935, she talked with the defendant, Lahoma Skelley, over the telephone, and defendant asked her if Fred Campbell was at her home; that she told the defendant that he was not there and the defendant asked her if Campbell had paid her some money that was due her, and she told the defendant that he had not; that she was not bothered

about the money because De Loyd had promised to pay her; that the defendant then stated that if she, the defendant, found the s—o—b's neither one of them would pay her, and then hung up the phone. She also testified that deceased came by her house in a car sometime before the shooting, but could not state the exact time, but that a negro boy was with him, that he did not get out of the car for the reason that he was double parked and told her that he would be back soon.

C. M. Tyler was called as a witness on behalf of the state, testified that he was the county evidence man in Oklahoma county. He identified the various state's exhibits as having been turned over to him by the various officers, after which said exhibits were introduced in evidence. He testified that the defendant told him they had a fight, and that Skelley, struck her on the head with the small gun and she did not know anything after that until she heard her sister calling the ambulance and saw Skelley on the floor. That the deceased Skelley had this gun pointed at her, and she had said, "That will go off," and had gotten ahold of it and pushed it around towards him and the shot was fired. He also stated that she made the statement that when she came home she had put the little gun on the telephone stand or a little stand near the telephone and that Skelley had put the larger gun on the divan in the front room, where he had placed his coat and vest before they had their dinner.

This constituted all of the evidence offered by the state in chief.

Edna Lahoma Skelley, the defendant, was called as a witness in her own behalf, and testified that the deceased, De Loyd Skelley, in his lifetime, was her husband; that they resided at 1014 Northwest Thirty-Fifth street; that he was engaged in the orange juice business and operated a policy wheel, and had an office on Sixteenth street; that he handled from $200 to $300 per day, and on several occasions had been hijacked while returning home late at night; that on the

afternoon of the 3d day of September, 1935, about 4:30 o'clock, she went to the office of Dr. Barker; that she went in a cab, and the deceased asked her where she was going; that after she went to the doctor's office she went to her husband's place of business on Sixteenth street and got the Ford car, and came home; that her husband was at home when she arrived, and appeared to be angry, and told her he did not believe she had been to the doctor's office; that she told him to call up and find out; that that led to a quarrel, and that they started quarreling about Fred Campbell; that he had the little hunting knife in his hand, and slapped her several times, and she went back to the kitchen and got a bread knife; that she went and got in the Ford car, which was on the driveway; that he followed her out and took the knife and the keys and started back in the house; that he said, "I think I will just tear things up," and he cut the window screen and threw the knife down and started to leave. She picked up the knife and said, "Well, I will just help you"; and that she then cut the screen; and then told him, "We are acting just like two kids"; and then she went in the bedroom; that she started to leave again, and went and got in the Buick car which was sitting in front of the house; that he came out and got in the Ford and drove the Ford up by the side of the Buick and got out and started to choke her; that she knocked the windshield out of the Buick, and he took the keys and left; that she then went in the house and was around there quite awhile; that she called Wheeler's Garage to see about getting a key for the Buick and then remembered that she had another set of keys at the house for the Buick and went and got them, and then went to Skelley's place of business on Sixteenth street; that at that time she and Skelley were over their mad spell, and he asked her if she was going to the drawing with him that night, and she said, "Yes."

She further testified that the little gun had been given to her by Skelley; that their house had been broken into several different times; that the little gun had been loaned

by Skelley and had been returned empty a few days before; that she had the gun with her when she went to Skelley's place of business, and asked Skelley about getting some shells for the gun, and he said: "If you have time, will you get them?" That she asked the porter where to get the shells, and he went and telephoned and told her where she could get them; that she then went to the drug store and bought the shells and had the clerk load the gun for her; that the other shells not placed in the gun were dropped in her purse; that he had some business to take care of and some money to collect and he went in the Ford car and she followed him in the Buick as he told her; that he asked her to keep driving around the block until he collected the money; that they then drove by the Butler Hotel as he wanted to see his aunt, Mrs. Arahevilla Ridenhour, and they stopped there a few minutes, as he was expecting a letter from Kansas City on that day; that she did not make the threat against Fred Campbell or her husband as related by Mrs. Ridenhour; that she did talk to her on the telephone and, at the time she talked to her, her husband was in the breakfast room; that about that time the phone rang and she answered the phone and it was Fred Campbell; that her husband came from the breakfast room through the dining room into the hall where the phone was located, and said: "Give me the phone," and she then hung up the receiver; that he became very angry, and grabbed hold of her; that the little gun which belonged to her had been placed on the writing desk in the hall; that he grabbed the gun off the writing desk and slapped or hit her several times; that she did not have the gun in her hands; that she did not fire the gun, and did not shoot the deceased, or have any intention of shooting him; that in the scuffle the gun was discharged and the next thing she knew they were at the hospital.

On cross-examination the defendant was interrogated at great length concerning her former marriages and concerning the date of her divorce from her last husband, and

the date of her marriage to the deceased, De Loyd Skelley. This cross-examination covered 11 pages of the record.

George L. Borecky testified in behalf of the defendant, and stated that he was the county jail physician; that in the month of September, 1935, the exact date he could not remember, he visited the defendant when she was confined in the county jail; that she had been in the county jail about two days when he saw her and had been in the city jail several days before being transferred to the county jail; that he examined her head and she had three abrasions right on the top of her head about the central portion; that they were about three-eighths of an inch long; that at the time of examining them they had scabbed over and were beginning to heal.

Bernice Bovers was called as a witness and testified, on behalf of the defendant, that she was a registered nurse, and was one of the nurses on duty who cared for De Loyd Skelley; that she was called on the case on the evening of September 3d, 1935, by Dr. Barker, and went on the case about 11:30; that he had been operated on at that time, and she took charge of the case as he came out of the operating room; that he died on the 5th day of September, 1935, and she was on duty when he died; that Miss Ealy, another nurse, relieved her during the time the deceased was her patient; she was asked the question: "During the time you waited on him, did he talk to you with reference to whether or not he thought he would recover?" Her answer was: "He told me he was going to die." She was then asked: "When did he tell you that?", and she answered: "On the morning that he did die, September 5th." She further testified that after he had told her he thought he was going to die, he stated that he and his wife were scuffling over a gun and it went off accidentally; that he made that statement the day he died, about 20 minutes prior to his death; that she was present when the deceased had a conversation with Clyde Scholes; that Mr. Scholes asked him

what happened, and he said: "I got shot"; and that Mr. Scholes asked him if Lahoma shot him, and he said, "No, we were scuffling over a gun, and it went off accidentally, and I don't want her prosecuted."

Sam Beatty, being sworn, testified that he was a graduate of the Oklahoma University Medical School, and was an intern at Oklahoma City General Hospital. That on September 3, 1935, he had occasion to help treat De Loyd Skelley, he did not have any conversation with him himself but heard others ask him how the shooting occurred and he said: "I heard him state that his wife did not shoot him."

Mary Etta Ealy testified that she was a registered graduate nurse, that she took care of the deceased, De Loyd Skelley, at the time he was brought to the hospital; that she was called by Dr. Barker on the case; that De Loyd Skelley told her there was no use for him to try to recover that he could not make it; that Officers Riggs and Jeter came to the hospital to talk to Skelley and he asked her to listen to the conversation; that Skelley stated to the officers: "My, God, we were scuffling over a gun and I don't want anything done. I want to free her, and I want to see her."

Clyde Scholes testified that he had worked for De Loyd Skelley from the first part of June, 1935, up until September 3, 1935; that he was working for him at the time of his death; that he saw Mrs. Skelley come in the store in the afternoon before Skelley was shot that night; that she did not appear to be angry when she came in, was smiling when he saw her. She went to the rear of the store and talked to Skelley and there was no demonstration or quarrel at that time. Later she and her sister came back to the store. Skelley went out to the car and talked to her, he did not pay any particular attention to what they were doing as no one had given him any reason to think anything was wrong. There was no fight at the car; that he went to the hospital after Skelley was shot and saw Skelley about 12:10

or 12:15, and Skelley was aware of the fact that he was not going to recover. He further testified as follows: "Q. What did he say? A. I asked how it happened, did Lahoma do it, and he said, 'No, it was an accident,' and asked me to call her up and see how she was getting along." A young lady nurse was there at the time of this conversation.

Zelda McLemore testified that she was a sister of the defendant, and was living at the Skelley home at the time of the shooting, was at the home the night the accident occurred; that Mr. and Mrs. Skelley came in about 10 or 10:30; that she was preparing for bed when she heard the report of the pistol. She heard the telephone ring, but did not pay any attention to it; the radio was on and she did not hear any noise or scuffling prior to the report of the gun; that when she heard the report of the gun she ran down into the living room, Skelley was lying on the floor and Mrs. Skelley was partly lying on the floor, she asked what had happened, and he said: "Zelda, there is an accident, call an ambulance," and he told her to call Dr. Barker, then took a large gun from his trousers and handed it to her and told her to put it away.

Charles E. Riggs testified that he was a city detective in the Oklahoma City police department, he had been a peace officer since 1921, had known the deceased, De Loyd Skelley, for approximately ten years; was called upon to investigate the shooting of De Loyd Skelley, that he and Officer Jeter went to the hospital the next day and talked to Skelley; that the nurse was present; that Skelley told him he had just a few hours to live and he would like to have his wife turned loose and brought up there to stay with him while he was alive. He further testified:

"Q. Did he say anything with reference to how he was injured? A. He did. Q. What did he say? A. He said they were scuffling over a pistol and it went off, and it was an accidental shot."

Paul Jeter testified that he was employed by the Okla-

homa City police department; that he went to the hospital after the shooting of De Loyd Skelley with Officer Charlie Riggs. His evidence was as follows:

"Q. Did you hear him make any statement as to how the accident occurred, or how he got shot? A. Yes, sir. Q. What did he say with reference to that? A. He said it was an accident. Q. Did he say anything else that you heard? A. Yes; he said some other things. Q. What were they? A. He said he wanted his wife turned loose and brought to the hospital."

Mrs. Arahevilla Ridenhour was called on rebuttal and testified that she went to the hospital to talk to De Loyd Skelley and he told her he was going to die, and further testified as follows:

"Q. Then did he make a statement to you about who shot him or how he come to be wounded? A. I asked him who shot him. Q. What did he say? A. He said Lahoma shot him. Q. What else did he say? A. I asked what in the world were you doing to let her shoot you, and he said he didn't know the gun was loaded."

With the close of the evidence the court instructed the jury. Counsel for defendant offered the following requested instruction:

"You are instructed that the defendant claims that the death of the deceased was brought about and caused by an accidental shooting and you are instructed that if you find from the evidence, or if you have a reasonable doubt thereof, that the death of the deceased was the result of an accidental shooting you should find the defendant not guilty and so say by your verdict."

The refusal of the court to give this requested instruction, together with the giving of other instructions, is assigned as error. It will be noted from a reading of the evidence in this case, and especially the evidence of the defendant, that the defense relied upon by defendant was that of "excusable homicide," based upon "accidental death." The defendant claimed that she did not have

possession of the gun at any time and that, in the scuffle between herself and deceased, the gun was accidentally discharged. An examination of the instructions given by the court reveals that the jury, at no time, were given an instruction outlining the defense offered by the defendant in this case, that of "accidental homicide," and when a requested instruction was offered by counsel for defendant the same was overruled by the court, to which the defendant excepted. The only charge given by the court that in any way referred to "excusable homicide" was instruction No. 12, which simply set out the statute, Okla. Stat. 1931, § 2235, Okla. St. Ann. tit. 21, § 731, p. 314, as follows:

"Homicide is excusable in the following cases: First, when committed by accident and misfortune in doing any lawful act by lawful means with usual and ordinary caution and without any unlawful intent, or, second, when committed by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, provided that no undue advantage is taken, nor any dangerous weapon is used, and that the killing is not done in a cruel and unusual manner. (Excepted to as not correct instruction on defendant's theory. Exception allowed. Clarence Mills, Judge.)"

We are of the opinion that the mere quoting of this statute, as above given, was not a sufficient instruction presenting to the jury the defense of the defendant as shown by the record in this case. There was no plea of self-defense, yet the judge presented to the jury instruction No. 17, as follows:

"You are instructed that if a person is assaulted in such a manner as to produce on the mind of a reasonable person a belief that he is in actual danger of losing his life or suffering great bodily harm, he will be justified in defending himself, though the danger be not real, but only apparent, and such person will not be held responsible criminally if he acts in self-defense from real and honest conviction as to the character of the danger, induced by reasonable

evidence, though he may be mistaken as to the actual extent of the danger.

"In determining whether or not the defendant had reasonable cause to apprehend or fear death or great bodily harm at the time and place here in question, the jury should, as far as possible, place themselves in the position occupied by the defendant at that time, and view the facts and circumstances of the case from the standpoint of the defendant and as they reasonably appeared to her, and if, after so doing, you entertain a reasonable doubt as to whether or not, at that time, she had reasonable grounds to apprehend or fear death or great bodily injury, and in good faith acted upon that apprehension, you should resolve that doubt in favor of the defendant and acquit her."

This instruction was followed by instruction No. 18, as follows:

"You are instructed that the right of self-defense is given to the citizen for her protection, and it cannot be pleaded as a defense and relied upon for an acquittal by one who, herself, is the aggressor, or by one who enters voluntarily into a difficulty, armed with a deadly weapon, no matter how great her danger or how imminent her peril may become during the course of the difficulty. (Excepted to by defendant. Not applicable to case. Exception allowed. Clarence Mills, Judge.)"

From a reading of these charges, it will be seen that the view of the court was that the defendant was entering a plea of self-defense and failed to consider the plea of "excusable homicide" by reason of "accidental death." From the instructions given as a whole, there is not much doubt that the jury considered her guilt from the standpoint of whether she acted in self-defense and not as to whether the shooting was accidental. Instruction No. 18 only had a tendency to confuse the jury and distract their mind from the real defense offered by this defendant, that of "excusable homicide" by reason of accident.

Not only this court, but every court in the land, has uniformly held that it is the duty of the court to present

to the jury instructions in plain and concise language, giving not only the contention of the state, but that of the defense, which is substantiated by evidence offered by the defendant upon a material issue, and it has always been held reversible error for the court to fail to give an instruction covering defendant's theory or defense, where the issue is material. Payton v. State, 4 Okla. Cr. 316, 111 P. 666, 667; McIntosh v. State, 8 Okla. Cr. 469, 128 P. 735; Crittenden v. State, 13 Okla. Cr. 351, 164 P. 675, 676; Golpi v. State, 14 Okla. Cr. 564, 174 P. 288; Tubby v. State, 15 Okla. Cr. 496, 178 P. 491; Davis v. State, 20 Okla. Cr. 203, 201 P. 1001; Moore v. State, 35 Okla. Cr. 257, 250 P. 538, 539; Miles v. State, 41 Okla. Cr. 283, 273 P. 284, 286; Johnson v. State, 59 Okla. Cr. 283, 58 P. 2d 156, 162.

In Payton v. State, supra, Judge Furman, Presiding Judge of this court, said:

"The court instructed the jury with reference to the law applicable to the evidence for the state, but the charge is silent as to the issue presented by the testimony for the defendant. As we understand the law, a defendant has the right to have a clear affirmative charge based upon the hypothesis that his testimony and the testimony of his witnesses is true, when this testimony affects a material issue in the case.

"Counsel for defendant requested eight special instructions, all of which were refused by the court. While we are not prepared to say that the court erred in refusing any one of the requested instructions, yet their general effect was to call the attention of the court to the point in issue, and the court should have instructed the jury correctly as to the law with reference to purchasing property in good faith, and then left it to the jury to say which testimony they believed. For this defect in the instructions, the case is reversed and remanded."

In McIntosh v. State, supra, the court said:

"Where an issue is properly presented by the evidence and the defendant requests it, he is entitled to an instruction upon the hypothesis that his testimony is true."

"Where the evidence reasonably presents that issue in a murder case, it is the right of the defendant to have a clear, affirmative, and clean-cut instruction upon the law of self-defense."

"Where an instruction requested by the defendant is not in proper form but pertains to a material issue in the case as made by the evidence, the court should correct it and give it in proper form, if it has not otherwise properly instructed the jury upon that issue."

In Crittenden v. State, supra, Judge Matson, speaking for the court, says:

"Upon the trial counsel for the defendant requested the following instruction, which was refused and an exception to the action of the court in refusing to give the same properly preserved at the time, and in the motion for new trial and in the petition in error:

" 'The jury is instructed that, if you believe from the evidence, or have a reasonable doubt thereof, that the defendant John Crittenden bought the steer in controversy in good faith from Julius Garland, not knowing the same had been stolen, then in that event you will acquit the defendant John Crittenden.'

"The trial court did not give any instructions in any way covering the defense relied upon. In our opinion, therefore, the refusal to give this requested instruction, or one affirmatively covering the defense interposed, is reversible error.

"The defendant * * * has a right to have a clear and affirmative instruction given to the jury applicable to his testimony, based upon the hypothesis that it is true, and when such testimony affects a material issue in the case."

In Miles v. State, supra, Judge Doyle, speaking for the court, says:

"The policy of the law is that all persons shall have a fair and impartial trial. It cannot be said that a fair and impartial trial has been had unless the jury has been properly instructed as to the law of the case; and where the instructions do not fully present all the material issues raised, the judgment of conviction will be set aside."

In Tubby v. State, supra, which was a murder case where the death penalty was assessed, in reversing the same, the court said:

"It is error for the trial court to fail and refuse to instruct on the law applicable to a theory of the defense which the evidence tends to support when the defendant requests it."

In the case of Moore v. State, supra, Judge Doyle says:

"This court has repeatedly held that it is error for the trial court to fail and refuse to instruct on the law applicable to a theory of the defense which the evidence tends to support, when the defendant requests it and when such evidence affects a material issue in the case. * * *

"We are of the opinion that in this case the refusal of the court to give the requested instruction, or one affirmatively covering the defense interposed, was reversible error."

In the case of Johnson v. State, supra, the defendant was charged with manslaughter in the first degree. It was claimed that he killed the deceased by hitting him with his fist. Defendant presented the defense that the killing was by accident and misfortune, and therefore, excusable homicide, as defined by the statute. The reported case does not give the instructions of the court, but we have examined the original record in the case, and find that the court, in instruction No. 12, gave the identical instruction as is given in the case at bar on excusable homicide, just as the statute defines it. The defendant then requested the court to instruct the jury as follows:

"You are further instructed that homicide is excusable in the following cases: When committed by accident and misfortune, in the heat of passion, upon sudden and sufficient provocation, or upon any sudden combat, provided that no dangerous weapon is used and the killing is not done in a cruel and unusual manner; and in this connection you are instructed that, if the homicide was committed by the defendant by accident and misfortune in the heat of passion, upon any sudden or sufficient provocation, or upon a sudden combat, and that the killing was not done in a cruel and

unusual manner and not with a dangerous weapon, the homicide would be excusable, and you should find the defendant not guilty."

This instruction was refused by the court and the defendant excepted. It was in accordance with the defense offered in that case, just as was the requested instruction in the case at bar. Judge Doyle, speaking for the court, in reversing the case for the failure of the court to give this and other instructions, says:

"It follows that the court, in refusing to give the requested instructions, denied to the defendant the right to have the jury properly instructed as to the law of the case and to say by their verdict whether he went farther than the law justified in preventing a trespass upon his premises and in defense of his person from threatened assault. * * *

"When requested, the defendant is entitled to an affirmative instruction covering any defense interposed when there is evidence tending to support such defense."

This case is directly in point with the issue raised in the case at bar.

The cases cited in the brief of the state fully uphold the principle announced above. In the case of Brandley v. State, 14 Okla. Cr. 479, 173 P. 661, the court says:

"When a person is tried upon a charge of murder, he is entitled to have all of the law applicable to his defense clearly stated to the jury in the charge of the court."

And cites with approval the cases of Turnbull v. State, 8 Okla. Cr. 459, 128 P. 743, and Swan v. State, 13 Okla. Cr. 546, 165 P. 627, both of which sustain the principle or rule above announced. We have heretofore referred to the case of McIntosh v. State, 8 Okla. Cr. 469, 128 P. 735, which is also cited by the State. The case of Parsons v. People, 218 Ill. 386, 75 N.E. 993, 994, relied upon by the state is not in conflict with the law as here announced. In that case there is nothing to show that the court did not instruct the jury upon the question of excusable homicide by accidental kill-

ing. An exception was taken to the instruction defining justifiable or excusable homicide given in the words of the statute. The court held that this was not error. We do not think it was error in the case at bar to define excusable homicide as defined by the statute, but we do believe that the court should have also presented to the jury an instruction giving defendant's theory of the case, under the statute, St. 1931, § 2237, 21 Okla. St. Ann. § 733.

The case of People v. Stokes, 11 Cal. App. 759, 106 P. 251, relied on by the state, is in no wise conflicting with the decisions above quoted. It was not contended in that case that the killing was accidental, nor did the defendant present to the court an instruction setting out this defense as in the case at bar.

The case of State v. Estes, 52 Utah, 572, 176 P. 271, 275, is clearly not in conflict with the position above taken. There is nothing to show that the question here involved was in this case.

This has been the uniform holding of the courts of other states. 14 R. C. L. 799, § 58; 30 C. J. 364; State v. Markel, 336 Mo. 129, 77 S.W. 2d 112; Campbell v. Commonwealth, 162 Va. 818, 174 S.E. 856; State v. Ledbetter, 332 Mo. 225, 58 S.W. 2d 453; Smiley v. Commonwealth, 235 Ky. 735, 32 S.W. 2d 51; State v. Stewart, (Mo. Sup.) 29 S.W. 2d 120; People v. Rallo, 119 Cal. App. 393, 6 P. 2d 516; Roberts v. State, 112 Ga. 542, 37 S.E. 879; French v. Commonwealth, 88 S.W. 1070, 28 Ky. Law Rep. 64. In Wharton on Homicide, § 354, p. 568, it is said:

"And when there is evidence in a prosecution for homicide tending to show misadventure, failure to instruct the jury as to the law with reference thereto is error, though no request was made for such instruction."

The evidence offered by the state in this case, so far as the actual shooting was concerned, was highly dependent upon circumstantial evidence. No eyewitness was produced

by the state. The only witness in the home at the time of the shooting, besides the defendant and deceased, was a sister of defendant, Miss Zelda McLemore. She was in her room and did not witness the difficulty. Her attention was first attracted by the shooting and, when she immediately appeared at the scene, the deceased said: "Zelda, there is an accident, call an ambulance." These were the first words uttered by the deceased after the shooting occurred. The deceased stated in the presence of six disinterested witnesses, among them being veteran officers of the law and highly trained nurses, that it was an accident; that they were scuffling over a gun and that she should not be prosecuted.

The defendant was arrested on the same night of the shooting. She was taken to police headquarters, she at that time made a written statement, and while this written statement was not introduced in evidence, when the county evidence man, Mr. Tyler, was on the witness stand, he testified that he had seen this statement; that the same was in the files of the county attorney, and the attorney for the defendant, while examining him, read from the statement, and it was revealed that the statement was practically the same as the evidence given by the defendant at the trial of this case. In this statement made on the night of the shooting she stated that the shooting was an accident and that deceased had made the same statement while on the elevator at the hospital while on his way to the operating room. From the above evidence it clearly appears that the defense offered by the defendant was that of excusable homicide by reason of an accident. The defendant was clearly entitled to a clear concise instruction giving her theory of the case, based upon the evidence offered.

It is contended by defendant that the court erred in permitting the county attorney, on cross-examination of defendant, to go into the marriage relation of defendant and deceased, for the purpose of showing that she had

married the deceased in the state of Illinois prior to six months from the date of her divorce and that they had returned to Oklahoma to live after the marriage. In another trial of this case these questions will probably not arise and it therefore becomes unnecessary for this court to pass upon this assignment of error. However, we call attention to the following cases from this court in which questions similar to this have arisen and with which all parties will in all probability familiarize themselves prior to the retrial of this case. Price v. State, 1 Okla. Cr. 358, 98 P. 447; Flohr v. Territory, 14 Okla. 477, 78 P. 565; Watson v. State, 7 Okla. Cr. 590, 124 P. 1101; Appleby v. State, 11 Okla. Cr. 284, 146 P. 228; Hager v. State, 10 Okla. Cr. 9, 133 P. 263; Scott v. State, 13 Okla. Cr. 225, 163 P. 553.

For the reasons above stated, the judgment of the district court of Oklahoma county is reversed, and defendant granted a new trial.

DAVENPORT, P. J., concurs.

DOYLE, J. (dissenting). I am unable to agree with the conclusions reached by my colleagues upon which the judgment of conviction is reversed.

It is not a pleasant duty to express one's dissenting views. However, in the present case, believing the majority opinion overrules what has been well-settled law of this jurisdiction, I feel bound to do so.

To a correct understanding of the issue presented the following brief statement of the facts disclosed by the testimony is made; also excerpts of the testimony of some of the witnesses, and of the defendant as a witness on her own behalf.

The theory of the prosecution was that the killing was an assassination.

De Loyd Skelley and the defendant, Edna Lahoma Skelley, were husband and wife; they lived at 1014 N.W.

Thirty-Fifth street, Oklahoma City; De Loyd Skelley at the time of his death was 34 years of age; his place of business was on N.W. Sixteenth street, known as the Morris Fruit Juice Company, he also operated a policy game, a method of gambling by betting as to which numbers would be drawn in a lottery, where the winners received certain sums of money.

On the afternoon of September 3, 1935, they met at their home, and a quarrel ensued. The defendant went to the kitchen, picked up a butcher knife and went out and got into one of their cars.

The deceased followed the defendant and pulled her out of the car, and took the butcher knife from her and threw it aside. Some of the neighbors saw the difficulty but were unable to understand the conversation between the parties. The deceased took the car key from the Buick and drove away in the Ford car. The defendant then attempted to start the Buick car, but could not start it, she kicked the windshield out and got out of the car and as she walked towards the house picked up in the yard the butcher knife and with it slashed the screens on the door and a window; soon after she left the place in the Buick car. It was then about 5 o'clock p. m. A little later she stopped at their place of business on Sixteenth street, she talked to her husband in his office; she came out with a pistol in her hand. When she got into the Buick car, her husband came out and talked to her and they had a scuffle while she was sitting there in the car.

After the tragedy a round of ammunition for the pistol which she was carrying was found where the scuffle occurred.

The porter at their place of business testified that Mrs. Skelley, driving a Buick car, stopped there about 6 and asked him if he knew where she could get some cartridges for her pistol, and he went into a beauty shop the next

door and called a drug store; then came back and told Mrs. Skelley she could get the cartridges at the drug store, corner of Reno and Walker; her sister was with her.

The defendant and her sister, Zelda McLemore, drove to said drug store where she purchased 19 cartridges, the druggist put 6 of them in the pistol for her, and the rest were put in her purse.

Sometime later the defendant went with her husband, the deceased, as was her custom, to assist in collecting the money from the policy game; she was carrying the same pistol. After they returned to their home that night, her husband was shot with this same pistol, and from the wounds so inflicted he died on September 5, 1935.

The police officers that answered the call to the home of the Skelleys testified that they found on a chair in the living room a .38 caliber loaded pistol, 1 cartridge having been fired, and found another pistol in a chest drawer, and also found a purse there containing 12 pistol cartridges and a small hunting knife.

Mrs. Ridenhour, an aunt of the deceased, living on West Grand avenue, testified that the night of the 3d of September she talked with the defendant over the telephone and the defendant asked her if Fred Campbell was at her home, and if he had paid her some money that was due her, she answered that he had not, that she was not bothered about the money because De Loyd had promised to pay her; that the defendant then said that if she, the defendant, found the s—o—b's neither one of them would pay her, and then hung up the phone; that the deceased came by her home in a car sometime before the shooting, could not state the exact time, but a negro boy was with him, and he did not get out of the car for the reason that it was double parked and told her he would be back soon.

C. M. Tyler, county evidence man, identified the various state exhibits introduced in evidence. He testified that

he went out to the house that night and did not see any furniture of any kind broken or turned over; that he saw the large gun out there.

He further testified:

"I talked with Mrs. Skelley on the afternoon of September 4; she told me that they had a fight, and that Skelley struck her on the head with the small gun, and she didn't know anything after that until she heard her sister calling the ambulance and saw Skelley on the floor. Later she said she had answered a telephone call and Skelley asked her who was calling and she said, 'That dope headed Fred Campbell,' and that he said she ought not to call people dope headed, and that she called Skelley a bald headed, dope headed son-of-a-bitch, and the fight started, that she heard a click and looked down and Skelley had this gun pointed at her, and she had said, 'That will go off,' and had gotten hold of it and pushed it around towards him and the shot was fired. Q. Did she tell you where Skelley got the little gun? A. She said that when she came home she had put the little gun on a stand near the telephone, and that Skelley had put the larger gun on the divan in the front room, where he had placed his coat and vest before they had their dinner."

When the state rested the defendant demurred to the evidence and moved the court to instruct the jury to return a verdict of not guilty, which demurrer and motion were overruled. Exceptions allowed.

As a witness in her own behalf the defendant testified that following their marriage they lived at 1014 N.W. Thirty-Fifth; that her sister and her brother lived with them; that Mr. Skelley had a double dip place and an orange juice place on Sixteenth street, and had a policy wheel, that he had two drawings a day on the east side, 2 o'clock in the afternoon and about 9:30 at night; that he would have an average of two or three hundred dollars after each drawing; that on the afternoon of September 3, about 4:30 o'clock she had an appointment at Dr. Barker's office and called a cab; Mr. Skelley came in and said, "Where are you going?" She said, "I am going to the doctor's office." He said, "If you will wait

a little while I will take you." She said, "No, I am late already," and went out, got in the cab.

She further testified:

"I came from the doctor's office to the place on 16th St., and got the Ford Car and came home, he was in the bathroom and I was reading the paper, he came out of the bathroom and says, 'Lahoma, I don't believe you have been to the doctor's office,' I said, 'Call up and find out.' He said he didn't have to, so we had a quarrel over that, and we started quarreling about Fred Campbell, he had a little hunting knife, I guess that is what it was, he slapped me several times and I went back to the kitchen and got a bread knife, and I came out. He laid this little knife down on the radio and as I started out I picked it up and put it in my purse and ran to get in the Ford, which was on the driveway, he followed me out and took the knife and keys and started back to the house. He said, 'I think I will just tear things up,' and he cut the screen window, and threw the knife down and started to leave. I picked up the knife and I said: 'Well, I will just help you' and I cut the screen, then I said, 'We are acting like two kids.' I went on in and came back and we started quarreling again about Fred Campbell, so I started to leave again, I ran out to the Buick in front of the house, he got in the Ford and drove around beside the Buick, and jumped out and said, 'Lahoma, I think I will kill you, I am going to choke you to death,' which he started to do, I knocked the windshield out of the Buick and he took the keys and left; I went in the house and washed my hands, I was around there quite a few minutes, then I thought about going to the drawing which I had been doing every night, I didn't have any keys to the car so I called Wheeler's garage, then a few minutes later I thought about a set of keys and I got a key and went over to the double dip place, when I got there I went in and asked if my sister was there and Fred Campbell, she said, 'No, your sister has gone home and Fred left a few minutes ago,' I went back and asked Mr. Skelley for the keys to the warehouse, he gave me the keys and I went to the warehouse and came back and we were talking about some of the boys being short. He asked me how I was feeling, I said, 'All right.' I went out and got in the car and he came out and said, 'Lahoma, are you going to the drawing with me?' and I

said, 'Yes.' I drove up, then I went by Mrs. Morris; my sister was there, and we went back and got the car and she and I went to the drug store and came back again, I asked the colored boy who was out in front to ask Skelley where to get the shells for the gun, he went in and came back and said Skelley was using the telephone and said, 'think I know, I will call up,' and he went into the beauty shop the next door. He came back and told me and we went and bought the shells at the Liberty Drug Store, at Reno and Walker. I mentioned to Mr. Skelley about the shells and he said, 'Lahoma, if you have time, will you get them.' I went to the drug store and the boy loaded the gun for me and had some extra shells, I told him to drop them in my purse, I paid him seventy five cents for the shells, and went back to the place on 16th St., and waited out in front for Skelley until he came out. He got in his car and said, 'Lahoma, do you want to go in the car with me, or do you want to take the Buick?' I said, I will drive the Buick and he said, 'All right,' I followed him, and he went several places and picked up the money sacks and I followed him out to the drawing over in east colored town, and I parked my car just behind his, and he brought me back the sacks, and I said, 'I will wait for you.' He said, 'Well, Lahoma, keep driving around the block,' and he said, 'Lahoma, the gun has not any shells in it,' I said, 'Yes, it has, I bought some tonight.' He said, 'Is that where you and Zelda went?' I said, 'Yes.' He said, 'Let me have the gun,' he gave it back to me and said, 'It is fixed for you in case anybody gets on the fender of your car, but be careful.' I kept driving until he came out and I followed him until he delivered all the boys except one; took them to their homes, then we came down Grand, just across the street from the Butler Hotel where Aunt Ridenhour lives, 224 West Grand. He sent the colored boy up to see if he had any letters, the boy came down and said there were not any letters, he was talking to him, his car was in front and I was just back, parked across the street from the Butler Hotel. We went on home, he parked in the driveway and I parked in front, I gave him the money sacks and laid the little gun on the writing desk in front of the telephone. In the conversation with Aunt R. I didn't make any threats against any one, after I talked to Aunt R., I started back to where Skelley was in the kitchen, the telephone rang and I went back and it was Fred Campbell, he came to the dining room and said, 'Give

me that receiver,' and I hung up, he grabbed the gun off the writing desk, he hit me several times and I really don't know just what happened after that, the next thing I knew we were in the living room lying beside the divan."

She was then asked and answered:

"Q. Did you fire the gun? A. No. Q. Did you shoot Mr. Skelley? A. No. Q. Well, after that, what happened, if anything? A. After that the next thing I knew we were at the hospital. Q. Did you take Mr. Skelley to the hospital? A. He went to the hospital in a cab. My sister called the ambulance and Dr. Barker, but she gave the ambulance the wrong address, and she called my brother and he jumped in a cab and came over in the cab, my brother and myself went to the hospital."

On cross-examination she testified:

"Q. When were you and De Loyd Skelley married? A. June, 1934. Q. Where? A. Chicago, Ill. Q. Who married you? A. A justice of the peace. I don't remember, I don't just recall who it was. Q. How long had you known Skelley? A. Well, I knew Skelley about three or four months before we married. Q. Where did you live before you married Skelley? A. I lived here in Oklahoma City. I have lived here since 1927. Q. What was your name before you married Skelley? A. Collins, Dick Collins. Q. What did he do? (Objection overruled.) A. He had a lot of slot machines. Q. He was in the slot machine racket, was he? The court: Objection sustained. I will strike that statement and instruct the jury to disregard it. Q. What was your name before you married Collins? (Objection overruled.) A. Sanford. Q. What was Mr. Sanford's name? A. Bob Sanford. Q. What was your name before that? A. McLemore. Q. When did you divorce Mr. Collins? (Objection overruled.) A. I don't remember that myself. Q. Had you been divorced six months when you married Mr. Skelley? (Objection sustained.) Q. Mrs. Skelley, when did you and Mr. Skelley get married? (Objection overruled.) A. We got married in Chicago in June, 1934. Q. Where did you get the divorce? A. Here in Oklahoma City. Q. What is your best judgment as to the month? A. (No answer.) Q. Well, is it not a fact that you got a divorce, to refresh your memory, in the month of March, 1934? (Objection overruled.) A. I just don't recall whether it was or not. Q. Is it not a fact that you don't

want to tell when you got the divorce? A. No; it is not at all. Q. After you got married in Illinois, did you come back to Oklahoma City? A. Yes. Q. Did you get a copy of your journal entry of divorce? A. Yes. Q. Did you have a copy of your divorce decree in your bag when Mr. Skelley was killed? A. No; I don't think so. Q. I will hand you this piece of paper for refreshing your memory and ask you if you ever saw that before? (Objection overruled.) A. I think I have. I am not sure whether that is the exact one or not, but something like that. Q. Now, are you able to state, after having read that, what date it was when you got your divorce? (Objection overruled.) A. I guess that was the date, March 22, 1934. Q. You got married on the 19th of June, in Illinois, didn't you? A. Yes. Q. You rented a place out at 1014 Northwest 35th Street, and you and Mr. Skelley lived there keeping house? A. Yes. Q. Was that the only place you and he lived together? A. Yes, sir. Q. Lived together as husband and wife? A. Yes. Q. Did Skelley want to talk on the phone? A. Yes. Q. And you hung up? A. That is right. Q. Then it was he picked up this little gun off of the table? A. Yes. Q. What did you say he did with it? A. When he picked it up, he started hitting at me, I am not sure whether with his fist or gun; he hit me several times over the head. Q. How many times did he hit you with the gun? A. I don't recall how many times. Q. Then, he hit you several times with his fist? A. Yes. Q. He hit you so hard he knocked you out so you could not remember, is that right? A. Yes, sir. Q. And that is all you remember? A. Yes. Q. And after it was all over he was shot, was he not? A. Yes. Q. He was shot in the abdomen, was he not? You saw where he was shot, did you not? A. No; I did not. Q. And he was shot in the front room, was he not? A. That I don't know. Q. Do you know who put the pistol upon the chair or divan? A. No; I don't know where it was. Q. And you did not see this big pistol after the shooting? A. No, I don't remember seeing it. Q. Had Skelley ever whipped you before? A. We had a couple of quarrels before. They didn't amount to much. Q. How often had he whipped you between June 23rd and September 3rd, the time you became his bride and the time he was killed? A. He never had whipped me before."

Zelda McLemore, sister of the defendant, testified that she was living in the Skelley home, and was working for

Mr. Skelley in the store on Sixteenth street, at the time the accident occurred; that she quit work that night about 6 or 6:30 and went home, Mr. and Mrs. Skelley were not there, they came in about 10 o'clock, that she let them in and went back to the bathroom, stayed in there perhaps 15 minutes and went to the bedroom when she heard the report of the pistol in the southwest room, ran in there and saw Skelley lying on the floor.

"I asked him what had happened, he says, 'Zelda, there is an accident, call an ambulance,' and asked me to call Dr. Barker. He pulled a gun from under his trousers and said, 'Zelda, take this and put it up.' I took it in the bedroom and dropped it in a drawer."

On cross-examination she was asked if she made a statement to the officers that was reduced to writing. She answered:

" 'I read it, but I did not sign it.' All, right, I will ask you if you did not state: 'When I first saw them, it seemed that Lahoma was trying to let Skelley down on the floor'? A. Well, he was lying on the floor and she had her arm partly around him, around his shoulders, that is the best I can remember."

Bernice Bovers, a registered nurse, testified that she was called by Dr. Barker about 11:30, and took charge of the case, as he came out of the operating room. He was shot in the abdomen, a little bit below the umbilicus. "He told me that he was going to die the morning of the day he died. He said: 'That he and his wife were scuffling over a gun and it went off accidentally.' "

She further testified:

"Q. Did you ever hear him tell any one else then about how he received this gun shot wound? A. Yes, sir, Clyde Scholes. Q. What did he tell Mr. Scholes? (Objection overruled.) A. Mr. Scholes came and asked him what happened to him, and he said, 'I got shot.' And Mr. Scholes asked him if Lahoma shot him, and he said no, 'We were

scuffling over a gun and it went off accidentally, and I don't want her prosecuted.' (Motion to strike overruled.)"

Sam Beatty testified that he was acting as an intern at the Oklahoma General Hospital and on the night of September 3, that he did not have any conversation with Mr. Skelley as to how the shooting occurred, but did hear him make a statement, that he didn't know whether he was conscious of the fact, that his chances of recovery were very remote, and did not know who he made the statement to, "I heard him state that his wife did not shoot him."

Marrietta Ealy, registered nurse, testified that she was called by Dr. Barker that morning and was on duty as the day nurse, that afternoon Officers Riggs and Jeter came in and wanted to ask him some questions.

Mr. Skelley said: "My God, we were scuffling over a gun and I don't want anything done, I want to free her, and I want to see her.

"Mr. Morris: We object to that.

"The Court: I understand that, but let the whole statement go in. (Overruled.)"

Clyde Scholes testified that he worked for Mr. Skelley from June, '35, up until the time of his death; that Mrs. Skelley was in and out of the place of business that evening about three times; that he visited Mr. Skelley at the hospital about 12:15 that night; that he asked him how it happened. "Did Lahoma do it?" And he said: "No, it was an accident."

Charles Riggs testified that he was a police department detective and the next day, with Officer Paul Jeter, went to the hospital and talked to Mr. Skelley. He said:

"He had just a few hours to live, he thought, and he would like to have her turned loose and brought up there and stay with him while he was alive." (Motion to strike overruled.) "He said they were scuffling over a pistol and it went off, and it was an accidental shot."

Paul Jeter testified that he went to the hospital with Charley Riggs, and he heard Mr. Skelley say:

"It was an accident and said: 'He wanted his wife turned loose and brought to the hospital.' "

In rebuttal Mrs. Ridenhour recalled testified that De Loyd Skelley was her nephew; that she visited him at the hospital that night and stayed for a part of the next day. That after daylight the next morning he said to her:

" 'Don't leave me, auntie; I am going to die,' he looked up at me—I was standing on the side of him, the nurse had laid him back down, and he said, 'Auntie, Lahoma shot me,' and I said, 'What in the world were you doing to let her shoot you?' and he said, 'I didn't know the gun was loaded.' "

Counsel in their brief say:

"It was the theory and contention of the defendant that after the defendant and the deceased arrived at their home the deceased assaulted the defendant, and during a scuffle, the pistol which was then in the hands of deceased, was accidentally discharged causing the fatal injury."

While it is of the utmost importance that the courts of this state in the trial, especially of homicide cases, be very careful to safeguard the constitutional and statutory rights of the accused, it is equally important that the taking of human life be not excused or justified, except in strict accordance with the established law.

Where an accused has been convicted and appeals to this court, the proceedings upon the trial are presumed to be regular and in conformity to the law, and, in order to procure a reversal, prejudicial error must affirmatively appear from the record. Every presumption favors the regularity of the proceedings had upon the trial.

Prejudice to the defendant is not presumed from error being made to appear in the absence of reasonably clear indications that the defendant was thereby prejudiced upon the merits, or that it tended to his prejudice in respect to

a substantial right. Weathers v. State, 35 Okla. Cr. 292, 250 P. 805.

Before this court is authorized to reverse a judgment of conviction because of the improper admission of evidence, it is necessary that the court, after a consideration of the entire record, must be of the opinion that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right of the defendant. Section 3206, St. 1931, 22 Okla. St. Ann. § 1068; Ford v. State, 23 Okla. Cr. 46, 212 P. 444.

The letter and spirit of the law is that if the defendant had a fair trial, and if this court is satisfied that the verdict reached against the defendant was not reached by error or as the result of passion or prejudice, the conviction should be affirmed. Cooper v. State, 12 Okla. Cr. 142, 152 P. 608; Smith v. State, 34 Okla. Cr. 318, 246 P. 883.

It is contended that the trial court erred in permitting the county attorney to cross-examine the defendant upon matters to which she made no reference in her direct examination, and to ask improper questions in a manner prejudicial to the defendant's rights.

I cannot agree with the conclusion of the court in its opinion, that this contention is well founded.

The rule obtains in this jurisdiction that a defendant, taking the witness stand and testifying in his own behalf, may be cross-examined the same as any other witness.

In Davis v. State, 58 Okla. Cr. 139, 50 P. 2d 755, 756, this court held:

"When a defendant on trial for murder voluntarily takes the witness stand in her own behalf, she waives all privileges which she is entitled to by remaining silent, and subjects herself to the same rules of cross-examination and impeachment as any other witness; and she may be asked if she has not made certain statements, declarations, or

admissions out of court inconsistent with her testimony in the cause, and if she admits making such statements or admissions, she may explain or show the circumstances and conditions under which the statements or admissions were made." Hennessee v. State, 58 Okla. Cr. 407, 54 P. 2d 217; Radney v. State, 36 Okla. Cr. 240, 253 P. 913; Graham v. State, 28 Okla. Cr. 266, 230 P. 763; Fowler v. State, 8 Okla. Cr. 130, 126 P. 831.

The defendant in her direct examination testified that the deceased was her husband.

On cross-examination she testified that she had lived in Oklahoma City since 1927; that on March 22, 1934, she secured a divorce in the district court of Oklahoma county from her previous husband, Dick Collins, that her first husband's name was Bob Sanford. That on June 19, 1934, she was married to De Loyd Skelley, in Chicago, Ill., and had lived with him as his wife in Oklahoma City, until the time of his death.

The statute provides that (section 674, St. 1931, 12 Okla. St. Ann. § 1280):

"And it shall be unlawful for any person who has a living husband or wife to marry another person in any other state within six (6) months from date of decree of divorcement granted in this state and cohabit with such second husband or wife in this state during said period. * * * Any person marrying or otherwise violating the provisions of this section shall be deemed guilty of bigamy."

Under this statute a person divorced within this state is prohibited from marrying any other person within six months from the date of the decree of divorcement, and a marriage entered into within this state within such period is invalid. And where a person is divorced in this state and during the prohibited period, for the purpose of evading the law of this state, goes into another state and marries another person, then returns to this state and cohabits with such second husband or wife during said period, he is guilty of bigamy. Harvey v. State, 31 Okla. Cr. 299, 238 P. 862, 51 A.L.R. 321.

In Castleberry v. State, 10 Okla. Cr. 504, 139 P. 132, this court held:

"The state has the right, on cross-examination, to show the nature of the relations existing between the witness and the defendant, so far as their relations are such as would create a bias that might reasonably be supposed to affect the credibility of the witness, and this rule cannot be changed by the fact that such evidence would probably prejudice the defendant in the minds of the jury."

As a general rule all matters that may modify, explain, contradict, refute, or make clear the facts testified to in chief by witness may be gone into on cross-examination, and in this connection it is proper to show by such examination the fact of immoral relations subsisting between the witness and the party for whom called. Pope v. State, 24 Okla. Cr. 213, 217 P. 498; Radney v. State, supra.

In Littrell v. State, 21 Okla. Cr. 466, 208 P. 1048, this court held:

"Evidence otherwise relevant is not rendered inadmissible because it shows the commission of another and different offense. Evidence disclosing another offense is often admissible for the purpose of showing felonious intent or circumstances indicative of guilt of the crime with which the defendant is charged." And see Cannon v. Territory, 1 Okla. Cr. 600, 99 P. 622; Sights v. State, 13 Okla. Cr. 627, 166 P. 458, 459; Underhill Crim. Ev. § 221.

In Kennamer v. State, 59 Okla. Cr. 146, 57 P. 2d 646, 658, we said:

"As to what is the proper practice on cross-examination of witnesses, there are two well-recognized rules; known as the English or orthodox rule, and the so-called American rule. In some states the orthodox rule obtains in all civil cases, and in respect to the cross-examination of witnesses for the prosecution in criminal cases, while the American rule governs the cross-examination of witnesses for the defense. According to the orthodox rule, the opposing party is not confined in his cross-examination to matters upon which the witness is examined in chief, but may extend

the cross-examination to every issue in the case. According to the American rule, a party has no right to cross-examine any witness except as to facts and circumstances connected with the matters stated in the direct examination.

"In some jurisdictions where the American rule is followed, it is held that the trial court may, in the exercise of sound discretion, relax the rule and allow the cross-examination to extend to matters pertinent to the issue, but not within the scope of the direct examination.

"This court in Hopkins v. State, 9 Okla. Cr. 104, 130 P. 1101, Ann. Cas. 1915B, 736, held that:

" 'On cross-examination of a witness, as a general rule, the party cross-examining should be confined to the matters concerning which the witness has been examined in chief, but this rule should be liberally construed so as to permit any question to be asked on cross-examination which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief, or to test his accuracy, memory, veracity, character, or credibility. This must necessarily include impeaching questions, although they may relate to matters independent of the questions, testified to in chief.'

"The extent, manner, and course of the cross-examination of a witness, even though it extends to matters not inquired about in his examination in chief, is very largely subject to the control of the court in the exercise of a sound discretion, and unless it affirmatively appears that this discretion was abused, the rulings of the court will not be reviewed on appeal. Hopkins v. State, supra.

"In the case of Creek v. State, 16 Okla. Cr. 492, 184 P. 917, it was held by this court that:

" 'The cross-examination of a witness is not to be confined to the particular questions asked, nor the precise subjects called to his attention, on direct examination. The correct rule is to allow the cross-examination to extend to any matter not foreign to the subject-matter of the examination in chief, which tends to limit, explain, or modify the same.'

"Regardless of the rule as to the scope of cross-examination on material matters, it is always permissible on cross-

examination to lay a foundation for impeaching a witness by proving prior contradictory statements. Not only may a witness' inconsistent statements be proven, but his inconsistent acts and conduct may be shown also."

It follows from what has been said there was no error or abuse of discretion upon the part of the trial court in its rulings on the cross-examination of the defendant.

In the opinion of the court it is said:

"The deceased stated in the presence of six disinterested witnesses, among them being veteran officers of the law and highly trained nurses, that it was an accident; that they were scuffling over a gun and that she should not be prosecuted."

As it will be necessary to have another trial in this case, I think it proper to call attention to the rulings of the trial court in the defendant's favor in overruling the objections of the county attorney to the admission of the statements of the deceased as dying declarations that "It was an accident," because the statement on its face was not one of fact, but was a mere opinion or conclusion.

In Mulkey v. State, 5 Okla. Cr. 75, 113 P. 532, this court held:

"Dying declarations must be restricted to facts concerning the cause and circumstances immediately attending the homicide, and forming a part of the res gestae, and must relate to facts, and not to mere conclusions or matters of opinion or belief."

In the opinion it is said:

"Mere conclusions or matters of opinion or belief, which would not be received if the declarant was a witness, are inadmissible, and, upon objection properly made, such statements or clauses should be rejected. * * *

"The rule that dying declarations should be confined to facts concerning the cause and circumstances of the homicide is one that should not be relaxed. It must be remembered that this kind of testimony is classed as hearsay evidence, and is admitted under an exception to the general

rule from considerations of public necessity. It is not under the sanction of an oath, and there is no opportunity for cross-examination. * * *

"In Wharton's Criminal Evidence (9th Ed.) par. 294, the rule is thus stated:

" 'Nothing can be evidence in a declaration in articulo mortis that would not be so if the party were sworn. On this rule, anything the murdered person, in articulo mortis, says as to the facts, is receivable, but not what he says as matter of opinion or belief.' "

In Young v. State, 70 Ark. 156, 66 S.W. 658, an opinion expressed by deceased after he was shot, that the shot was accidentally fired, was held inadmissible in that, "It was only a matter of opinion of deceased."

In State v. Wright, 112 Iowa 436, 84 N.W. 541, the Supreme Court of Iowa held:

"Dying declarations that deceased did not believe that defendant intended to kill him are not admissible in a prosecution for homicide, since they are the mere statements of opinion."

And see Hollywood v. State, 19 Wyo. 493, 120 P. 471, 122 P. 588, Ann. Cas. 1913E, 218; State v. Finley, 245 Mo. 465, 150 S.W. 1051; Kearney v. State, 101 Ga. 803, 29 S.E. 127, 65 Am. St. Rep. 344.

It is hardly necessary to say that the statements made by the deceased that "I don't want her prosecuted" were not admissible.

The controversy in a homicide case is not between the deceased and the defendant, but between the state and the defendant; and I know of no rule which renders competent in favor of the defendant any declaration of the deceased which is not a part of the res gestae, or competent as a dying declaration.

The court of his own motion gave 30 instructions, submitting the issues of murder, manslaughter in the first

and second degree, and the law of justifiable and excusable homicide.

Exceptions were taken to instructions Nos. 12, 18, and 22.

The defendant requested the court to give the following instruction:

"You are instructed that the defendant claims that the death of the deceased was brought about and caused by an accidental shooting, and you are instructed if you find from the evidence, or if you have a reasonable doubt thereof, that the death of the deceased was the result of an accidental shooting you should find the defendant not guilty and so say by your verdict."

"Endorsed: Defendant's requested instruction. Presented to court after jury instructed—before argument. Refused. Exception allowed. Clarence Mills, Judge."

The opinion of the court holds that it was reversible error on the part of the trial court to refuse to give the foregoing instruction.

Upon the general subject of the requested instruction, the trial court gave the following instructions:

"No. 9. Homicide is manslaughter in the first degree when perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor, or when perpetrated without a design to effect death and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon, unless it is committed under such circumstances as constitute excusable or justifiable homicide, or when perpetrated unnecessarily, either while resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed."

"No. 10. Manslaughter in the second degree is any killing of one human being by the act, procurement or culpable negligence of another which does not constitute murder or manslaughter in the first degree or excusable or justifiable homicide."

"No. 11. While the information charges the crime of murder, that charge includes the lesser crime of manslaughter mentioned in these instructions."

"No. 12. Homicide is excusable in the following cases:

"First, when committed by accident and misfortune in doing any lawful act by lawful means with usual and ordinary caution and without any unlawful intent, or

"Second, when committed by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, provided that no undue advantage is taken, nor any dangerous weapon used, and that the killing is not done in a cruel and unusual manner.

"'(Excepted to as not correct instruction on defendant's theory. Exceptions allowed. Clarence Mills, Judge.)'".

Instructions Nos. 24 and 26 are as follows:

"No. 24. You are instructed that if you find from the evidence beyond a reasonable doubt that the defendant, in Oklahoma county, Okla., and on the 3rd day of September, 1935, wilfully, unlawfully, wrongfully and feloniously, without authority of law, and with a premeditated design to take the life of De Loyd Skelley, and with a certain 38 caliber revolver, as charged in the information, inflicted upon the body of said De Loyd Skelley, certain mortal wounds from which he lingered and died on the 5th day of September, 1935, then it will be your duty to find the defendant guilty of the crime of murder, as charged in the information, and so say by your verdict.

"However, if you entertain a reasonable doubt as to the guilt of the defendant of the crime of murder, as charged in. the information, you will resolve that doubt in favor of the defendant and acquit her of the charge of murder, and then you may inquire as to whether or not she is guilty of the crime of manslaughter in the first degree, and if you find from the evidence beyond a reasonable doubt that the defendant, in Oklahoma county, Okla., on the 3rd day of September, 1935, wilfully, unlawfully, wrongfully, feloniously and without authority of law inflicted upon the body of De Loyd Skelley certain mortal wounds of which he lingered and died on the 5th day of September, 1935, but that such act of killing was perpetrated without a design to effect the death of De Loyd Skelley, and was committed

in a heat of passion and by means of a revolver, then you will find the defendant guilty of manslaughter in the first degree, as that charge is embraced within the charge set forth in the information, and so say by your verdict.

"However, if you should entertain a reasonable doubt as to the guilt of the defendant of either the crime of murder or the crime of manslaughter in the first degree, you will resolve that doubt in favor of the defendant and acquit her of those two crimes, and then you may inquire as to whether or not she is guilty of the crime of manslaughter in the second degree, and if you find from the evidence beyond a reasonable doubt that in Oklahoma county, Okla., on the 3rd day of September, 1935, the defendant wilfully, unlawfully, wrongfully, feloniously and without authority of law, inflicted upon the body of De Loyd Skelley certain mortal wounds from which he lingered and died on the 5th day of September, but that such act of killing was perpetrated by the act, procurement or culpable negligence of the defendant, then you will find the defendant guilty of manslaughter in the second degree, and so say by your verdict, unless you should find, or have a reasonable doubt thereof, that said killing was committed under such circumstances as constitute justifiable or excusable homicide, in which event you should acquit the defendant."

"No. 26. If, from the evidence, you are satisfied beyond a reasonable doubt that the defendant is guilty of murder or of manslaughter in the first degree or of manslaughter in the second degree, but have a reasonable doubt as to which of said offenses she is guilty, then you must give her the benefit of that doubt and not find her guilty of a higher offense than manslaughter in the second degree."

The trial court in instruction No. 19 submitted the law applicable to threats of violence made by the deceased against the defendant, but failed to instruct on the law of threats made by the defendant against the deceased.

In the majority opinion it is said:

"The only charge given by the court that in any way referred to 'excusable homicide' was instruction No. 12, which simply set out the statute." Quoting section 2235 Penal Code, 21 Okla. St. Ann. § 731.

"We are of the opinion that the mere quoting of this statute, as above given, was not a sufficient instruction presenting to the jury the defense of the defendant as shown by the record in this case."

A sufficient answer to this statement is to again quote a part of the last paragraph of instruction No. 24, which reads:

"And if you find from the evidence beyond a reasonable doubt that in Oklahoma county, Okla., on the 3rd day of September, 1935, the defendant wilfully, unlawfully, wrongfully, feloniously and without authority of law, inflicted upon the body of De Loyd Skelley certain mortal wounds from which he lingered and died on the 5th day of September, but that such act of killing was perpetrated by the act, procurement or culpable negligence of the defendant, then you will find the defendant guilty of manslaughter in the second degree, and so say by your verdict, unless you should find, or have a reasonable doubt thereof, that said killing was committed under such circumstances as constitute justifiable or excusable homicide, in which event you should acquit the defendant."

In the court's opinion, continuing, it is said that:

"There was no plea of self-defense, yet the judge presented to the jury Instruction No. 17 [and 18], as follows: [Quoting.] * * *

"From a reading of these charges it will be seen that the view of the court was that the defendant was entering a plea of self-defense and failed to consider the plea of 'excusable homicide' by reason of 'accidental death.' From the instructions given as a whole, there is not much doubt that the jury considered her guilt from the standpoint of whether she acted in self-defense and not as to whether the shooting was accidental. Instruction No. 18 only had a tendency to confuse the jury and distract their mind from the real defense offered by this defendant, that of 'excusable homicide' by reason of accident. * * *

"In the case of Johnson v. State, supra, [59 Okla. Cr. 283, 285, 58 P. 2d 156], the defendant was charged with manslaughter in the first degree. It was claimed that he killed the deceased by hitting him with his fist. Defendant

presented the defense that the killing was by accident and misfortune, and therefore, excusable homicide, as defined by the statute. * * *

"This case is directly in point with the issue raised in the case at bar."

I do not agree with the conclusion that the question presented in the Johnson Case is the question in the case at bar.

In the Johnson Case this court held:

"Instructions should be applicable to facts and to all proper deductions and interpretations thereof, and not to question not presented or covered by evidence. * * *

"When requested, the defendant is entitled to an affirmative instruction covering any defense interposed when there is evidence tending to support such defense."

In the opinion we said:

"The rules of law applicable to a case of this character are plain and simple, and the instructions should not extend beyond a plain statement of the law applicable to the case.

"The instructions as to excusable homicide by reason of accident and misfortune fail to present affirmatively the issue of accidental homicide.

"The word 'misfortune' as used in section 2235, [21 Okla. St. Ann. § 731] defining excusable homicide, is analogous to the word 'misadventure,' which, when applied to homicide, means the act of a man who is doing any lawful act and without any unlawful intent unfortunately kills another person. Gaunce v. State, 22 Okla. Cr. 361, 211 P. 517. * * *

"The testimony on the part of the state is insufficient to show that the offense charged, manslaughter in the first degree, was committed, and that issue should not have been submitted to the jury.

"The lawfulness of the act resulting in the death of Mr. Thomason was the defense. Accidental death to be wholly excusable must have resulted from the doing of some lawful act. * * *

"It is undisputed that the defendant was on his own premises where he had the right to be, and he had the right to use necessary and sufficient force to defend his habitation from unlawful entrance, or to prevent a trespass on the premises, also to prevent an offense against his person, 'provided no undue advantage is taken nor any dangerous weapon used.' "

In Philby v. State, 64 Okla. Cr. 1, 76 P. 2d 412, 413, it is said:

"Where the death of a person is caused by culpable negligence of another under circumstances that homicide is not murder or manslaughter in the first degree, or excusable or justifiable homicide, it is 'manslaughter in the second degree.' "

" 'Culpable negligence' is not defined by our statute. In Kent v. State, 8 Okla. Cr. 188, 126 P. 1040, it is defined as: 'The want of that usual and ordinary care and caution in the performance of an act usually and ordinarily exercised by a person under similar circumstances and conditions.' * * *

"Accidental death to be wholly excusable must have resulted from the doing of some lawful act. Johnson v. State, 59 Okla. Cr. 283, 58 P. 2d 156." And see Clark v. State, 27 Okla. Cr. 11, 224 P. 738.

In Gaunce v. State, supra, it is said:

"Justifiable homicide is the taking of human life under circumstances of justification, as a matter of right, such as self-defense, or other causes set out in the statute. Excusable homicide is where death results from a lawful act by lawful means, accomplished accidentally or by misfortune or misadventure, or so accomplished with sufficient provocation, with no undue advantage and without unnecessary cruel treatment. * * *

"The constituent elements of excusable homicide are three, viz.: First, absence of an intent to do harm; second, the lawfulness of the act resulting in death; third, proper precaution to avoid mischief. Notes, annotations and citations, 3 L.R.A. (N.S.) 1153."

In the case of Jabich v. People, 58 Colo. 175, 143 P. 1092, the Supreme Court of Colorado held:

"To establish 'excusable homicide by misadventure,' it must appear that the person killing was engaged in a lawful act, that he was free from carelessness, and that he did not intend to but accidentally killed another."

In the opinion it is said:

"Excusable homicide by misadventure, not self-defense, was the theory upon which defendant relied. Three elements enter into this defense. It must appear: First, that the person killing was engaged in a lawful act; second, that he was free from carelessness; and third, that he did not intend to but accidentally killed another. If any of these is lacking, the plea is unavailing. For the purpose of showing he was engaged in the lawful act of self-defense, defendant claims he had been assaulted. If the homicide occurred while he was engaged in an unlawful act, misadventure is eliminated as a defense. As his right to assert the defense of misadventure depended upon his being engaged in a lawful act, so whether he was engaged in a lawful act or not depended upon the principles of self-defense. If there was an encounter in which there was no claim that the killing was done in self-defense, and no such defense was interposed, but defendant claimed he was assaulted and was lawfully defending himself, and during the encounter the deceased was accidentally killed, the court should have instructed, in connection with the law of misadventure, upon the law of self-defense; not because it was interposed and relied upon as a defense, but to aid the jury in determining whether the killing was accidental while defendant was engaged in doing a lawful act. In determining this question the principles of self-defense were involved. Ryan v. State, 115 Wis. 488, 92 N.W. 271; Pinder v. State, 27 Fla. 370, 8 So. 837, 26 Am. St. Rep. 75."

It is elementary and thoroughly well settled in this jurisdiction that in homicide cases, as well as others, the court must charge on every issue or theory of defense which the evidence tends to support, and when the court instructs the jury as to the several degrees of homicide as defined by the statute, he should also give to them the circumstances

that constitute the exceptions mentioned in the statute wherein the killing is declared to be justifiable or excusable. It is my opinion that the instructions given by the court in this case conform to this requirement.

The irresistible inference from the testimony on the part of the state is that the killing was a felonious homicide.

The evidence on the part of the defendant tended to show that the homicide was involuntary manslaughter. According to the defendant's own voluntary statements to the officers, admissions deliberately made the next day after the fatal shot was fired, the shooting was in self-defense. Her statement in part was "That she called Skelley a bald-headed, dope headed son-of-a-bitch, and the fight started, that she heard a click and looked down and Skelley had this gun pointed at her, and she said, 'That will go off' and had gotten hold of it and pushed it around toward him, and the shot fired."

As the only eyewitness of the shooting, she testified: "He came to the dining room and said, 'Give me that receiver,' and I hung up, he grabbed the gun off the writing desk and hit me several times, and I really don't know just what happened after that, the next thing I knew we were in the living room, lying beside the divan."

The instruction requested and refused is not a correct statement of the law applicable to the evidence or the law of excusable homicide.

In Schmitt v. State, 57 Okla. Cr. 102, 47 P. 2d 199, this court held:

"The general rule is that if a man uses a deadly weapon, not in self-defense, and life is taken, he is presumed to intend the natural and necessary consequence of his own act. However, the presumption arising from the character of the weapon used is not conclusive as to his intent."

Involuntary manslaughter is where death results unintentionally, so far as the defendant is concerned, from an

unlawful act on his part, not amounting to a felony, or from a lawful act negligently performed. Wharton's Crim. Law, par. 305.

13 Ruling Case Law, p. 863, § 166, reads in part as follows:

"Whether in any particular case the homicidal act was the result of accident must be gathered from all the facts and circumstances surrounding the transaction, and it is peculiarly within the province of the jury to determine this, according to the well settled rules of law."

Under the evidence on the part of the defendant the issue was whether the homicide was involuntary manslaughter or was the result of an accident, and therefore excusable within the meaning of section 2235, Penal Code, 21 Okla. St. Ann. § 731, providing:

"Homicide is excusable in the following cases:

"1. When committed by accident and misfortune, in lawfully correcting a child or servant, or in doing any other lawful act, by lawful means, with usual and ordinary caution, and without any unlawful intent.

"2. When committed by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat provided that no undue advantage is taken, nor any dangerous weapon used, and that the killing is not done in a cruel or unusual manner."

The undisputed facts are that the defendant and the deceased were engaged in a fight at the time the fatal shot was fired; that they were both engaged from the time, about 5 o'clock p.m., when the quarrel commenced, up until the fatal shot was fired, about 10 o'clock, in the commission of a felony as defined by section 2312 of the Penal Code, 21 Okla. St. Ann. § 1053, prohibiting lotteries, and were both during that period of time carrying deadly weapons on their persons in violation of section 2584 of the Penal Code, 21 Okla. St. Ann. § 1272, making it a misdemeanor.

In the majority opinion it is said: The cases of Parsons v. People, 218 Ill. 386, 75 N.E. 993, 995, People v. Stokes, 11 Cal. App. 759, 106 P. 251, 252, and State v. Estes, 52 Utah, 572, 176 P. 271, 275, are not in conflict with the rule announced.

In Parsons v. People, affirming conviction for wife murder, it is said:

"The only question is whether or not his statement is true that he killed her accidentally, mistaking her for a burglar, or whether he willfully murdered her. * * *

"Whether the homicide was justified or excusable for the reasons stated by the plaintiff in error was a question of fact for the determination of the jury. * * *

"Objection is also made to the fifth instruction, given for the state. We see no objection to this instruction, as it merely defines justifiable homicide in the same language literatim et verbatim, as is used in section 148 of the Criminal Code. [Ill. Rev. Stat. 1937, c. 38, § 366]" And see People v. Simpson, 270 Ill. 540, 110 N.E. 830; People v. Laures, 289 Ill. 490, 124 N.E. 585.

The opinion in the Stokes Case, after quoting the statute defining excusable homicide, concludes:

" 'But if you believe from the evidence beyond a reasonable doubt that the defendant unlawfully killed Thomas C. Rowley in the commission of an unlawful act, not amounting to a felony, then the homicide is not excusable, and you should find the defendant guilty as charged in the information.' It is sufficient to say that the instruction complained of, when coupled with the instructions immediately following, correctly states the law."

In the Estes Case, the Supreme Court of Utah, speaking through Chief Justice Frick, said:

"It is next contended that the court erred in refusing defendant's request to charge on the plea of self-defense. There is no merit to this contention. The court's instruction on that subject clearly reflected the law. Nor is the contention tenable that the court erred in its instruction

when it told the jury when and under what circumstances the killing of a human being is either justifiable or excusable. What counsel complains of in that regard is that the court, in the instruction, set forth all of the different grounds of justification and excuse contained in the statute. While it is true that some of those grounds might have been omitted, yet we cannot conceive how the fact that the whole statute was copied by the court in its instruction could have misled the jury or could have prejudiced the defendant. Neither has counsel made it appear how such was the case."

In Baker v. State, 22 Okla. Cr. 224, 210 P. 292, 293, this court held:

"The instructions must be applicable to the evidence. An instruction, although incomplete, is not ground for reversal if it fairly covers the law on a matter in which the evidence is not in dispute."

In Smith v. State, 14 Okla. Cr. 250, 174 P. 1107, this court held:

"Where the instructions given by the court are correct and are as favorable to the defendant as the evidence would warrant, the refusal to give other instructions requested by the defendant on the same subject is not such prejudicial error as would authorize the reversal of a judgment of conviction." And see Fitzsimmons v. State, 14 Okla. Cr. 80, 166 P. 453.

It needs no citation of authorities to make clear that this court has always held that instructions should be considered as a whole, and that it is not improper to refer in one instruction to another.

The instructions in the instant case taken together and considered as a whole clearly shows that the jury were properly and correctly instructed upon the law of the case. In fact the instructions were more than favorable to the defendant.

It is often said that the law is confessedly tender of rights of persons accused of crime, but it is hardly subject

to the charge of authorizing them to build up a theory of innocence upon fictitious or fraudulent assumptions.

The objection to the sufficiency of the evidence to support a conviction is untenable. It is obvious that the case was one for the jury. It was for the jury to judge of the weight of the evidence and the credibility of the witnesses.

After a most careful examination of this case, both as to the law and the evidence, I have failed to discover anything whereof the defendant has any just right to complain.

Upon the entire record, the conclusion is reached that the defendant was fairly tried and properly convicted.

I am therefore constrained to dissent from the opinion of the court.